Robert G. FLEMING, Plaintiff–Appellee,

v.

COUNTY OF KANE, STATE OF ILLINOIS, and Nabi R. Fakroddin, Defendants–Appellants.

No. 88–2385.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 7, 1989.

Decided March 27, 1990.

---

Gerald J. Brooks, Steven B. Adams, Fawell, James & Brooks, Naperville, Ill., for plaintiff-appellee.

David R. Akemann, Office of the State's Atty. of Kane County, Geneva, Ill., Gerard B. Gallagher, Peter A. Bauer, Mark C. Amador, Patricia J. Stiles, David L. Joslyn, Gallagher & Joslyn, Oakbrook Terrace, Ill., Robert F. Casey, Casey & Krippner, Geneva, Ill., for defendants-appellants.

Before FLAUM, RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

In the § 1983 action underlying this appeal, Robert G. Fleming (hereinafter "Fleming" or "plaintiff"), alleged that defendants, Kane County and its Highway Superintendent, Nabi R. Fakroddin, harassed and ultimately dismissed him from his position with the Kane County Highway Department in violation of his first and fourteenth amendment rights. Fleming maintained that he was terminated in retaliation for his vocal criticism of the bid-letting procedures surrounding a road construction contract. After a jury trial, the district court entered a judgment in favor of Fleming. Defendants filed post-trial motions praying for: (1) a judgment notwithstanding the verdict, or alternatively, for a new trial; or (2) for a remittitur of damages if their motions for a JNOV or new trial were denied. The district court issued an order denying defendants' post-trial motions, except to the extent of granting defendants a new trial on the damages issue if Fleming did not accept a remittitur in the damage award in the amount of $80,000. 686 F.Supp. 1264. Fleming accepted the remittitur and a final judgment was entered in favor of Fleming in the amount of $157,574.19.[1] Fleming was subsequently awarded attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, in the amount of $205,176.19. Defendants appeal from these final decisions.

## FACTUAL SUMMARY

Robert G. Fleming served as the Assistant Superintendent of Highways for Kane County from 1968 until his termination by Nabi Fakroddin on June 7, 1984. From 1969 until March 1, 1984, William Carter served as Superintendent of Highways for Kane County and, by virtue of that position, was Fleming's immediate supervisor. Carter unexpectedly resigned this position prior to the end of his term. Upon Carter's formal resignation on March 1, 1984, Nabi Fakroddin commenced his tenure as Superintendent of Highways. After a series of disciplinary measures ostensibly imposed pursuant to a "progressive discipline" scheme, Mr. Fakroddin terminated Mr. Fleming on June 7, 1984.

At trial, Fleming alleged that his termination was in retaliation for his vocal criticism of Kane County's construction of an overpass over the East–West Tollway at Orchard Road ("the Orchard Road project"). Specifically, Fleming questioned the integrity of the bid-letting procedures surrounding that contract.[2] Fleming's responsibility on the Orchard Road project, as it had been on other similar projects, was to review the submissions for the

---

1. This final judgment represents: $87,283.99 for lost earnings; $30,290.20 as compensation for Fleming's premature withdrawal from his annuity; and $40,000 for emotional distress, reduced from $120,000 by the $80,000 remittitur.

2. The stipulated facts show that the general contract for the Orchard Road project was let to A.J. Maggio Co. for $1,163,700. One element of this construction package called for the excavation, transportation, and placement of "suitable borrow" material to serve as the foundation for

the pavement base. Originally, the borrow material was to be excavated from a site 2.9 miles from the construction site. After the contract was awarded, however, the borrow pit location was changed to a location approximately 1,000 feet from the construction site, resulting in a significant reduction in the haul mileage. The contract for the Orchard Road project was not relet, nor was a reduction made to the contract price to reflect this reduction in haul mileage.

project and approve the monthly pay estimates. Because the project file failed to document the changed location of the borrow pit or any reduction in the contract price to offset the savings which resulted from that relocation, he refused to approve the monthly pay estimates for that project.

Fleming's discontent with the letting of the Orchard Road project manifested itself over the ensuing months in the form of various communications with county and state officials. Fleming contacted the Kane County State's Attorney's Office, the Illinois Attorney General's Office, the FBI, the Kane County Clerk, and the ten contractors who had bid on the Orchard Road project and been rejected. Each of these communications conveyed the perception that a "cover up" of the alleged impropriety of this project's letting procedures was being undertaken by the various Kane County officials involved.[3] Fleming alleged at trial that it was in retaliation for these "whistle-blowing" activities that he was terminated.

Contrary to Fleming's allegations in his first amendment claim, defendants maintained that Fleming's termination was a result of his poor work performance and insubordination. Evidence in support of both contentions was presented at trial. Specifically, defendants pointed to various instances in which Fleming allegedly failed to adequately perform tasks which he was assigned by Mr. Fakroddin. Moreover, defendants presented testimony from Mr. Fakroddin and other employees regarding instances in which Fleming had allegedly directed obscene gestures and verbal insults at Mr. Fakroddin and others in the department.

In returning its verdict in favor of Fleming, the jury determined otherwise. Specifically, the jury found that Mr. Fleming was terminated because of his "whistle-blowing" activities with respect to the Orchard Road project. Moreover, the jury found that defendants would not have terminated

Fleming had it not been for his vocal criticism of the procedures surrounding the Orchard Road project.

Defendants raise four separate issues in this appeal. First, defendants argue that the district court abused its discretion in excluding from trial defendants' proffered evidence regarding the apparent propriety of the procedures surrounding the Orchard Road project. Second, defendants argue that the district court erred in denying their motions for a JNOV, or alternatively, for a new trial. Third, defendants argue that the damages awarded were against the manifest weight of the evidence. Finally, defendants argue that the court's award of attorney's fees under § 1988 was excessive.

## ANALYSIS

### Exclusion of Orchard Road Evidence

The extent to which the jury was exposed to evidence regarding the alleged improprieties surrounding the award of the Orchard Road project underlies the primary issue presented for review in this appeal. This evidence was generally excluded from trial pursuant to the district court's rulings on various pre-trial motions as well as evidentiary objections at trial. The manner in which these motions were pursued is as follows.

On September 10, 1987, Fleming filed a motion to exclude the testimony of defendants' expert Howard Schwark, a former Superintendent of Highways for Kankakee County. Defendants had indicated that they would call Schwark to testify that there was no impropriety in the procedures surrounding the letting of the Orchard Road project. This motion was granted by the district court on September 18, 1987. In granting this motion, the district judge reiterated the stance which he would adopt toward this type of evidence throughout the trial—i.e., that, for the purposes of

---

**3.** One such letter was actually more of a story written by Mr. Fleming entitled "Collusion or Gross Stupidity" (the "Collusion Letter"). As his introduction to this "story," Mr. Fleming states, "[t]his is a story about collusion between a top

Kane County Government Official and a Contractor, or is it a story about gross stupidity on the part of the Government Official, you be the judge."

Fleming's first amendment claim, it did not matter whether his criticisms of the Orchard Road project were in fact justified. In excluding both plaintiff's and defendants' evidence on the actual merits of the Orchard Road project, the district judge was attempting to prevent the parties from engaging in a "mini-trial" on that subject. During the course of this same hearing, however, the trial court ruled that Fleming would be permitted to introduce limited evidence regarding the Orchard Road project as "background" to explain his reasons for vocally criticizing the project.

Thereafter, defendants filed a Motion in Limine or, Alternatively, Defendants' Motion to Reconsider, and Offer of Proof Regarding the Orchard Road Project. Defendants sought to preclude Fleming from presenting any evidence beyond a general statement to the effect that he disputed the procedures surrounding the Orchard Road project. Defendants' concern was that Fleming would present "just enough evidence" to raise an unrebutted inference that there was corruption on the part of the County officials and, in so doing, prejudice the jury. In the alternative, defendants requested the court to reconsider its order granting plaintiff's motion in limine on Howard Schwark's testimony. Finally, defendants made an Offer of Proof in which they offered evidence which, if allowed at trial, would have shown that: (1) the local and main Illinois Department of Transportation offices reviewed and approved of the change of the borrow pit site; (2) the change of site was entirely legal and proper; (3) the decision to change the site was made after reviewing other less efficient options; and, (4) the option chosen saved the County up to $400,000 and completed the project ahead of schedule. These motions were orally denied by the

court during a status hearing on October 1, 1987.

During the course of the trial, Fleming was permitted to introduce as "background" evidence certain of his perceptions regarding the Orchard Road project. Specifically, Fleming was permitted to read his "Collusion or Gross Stupidity" letter into evidence. In addition, plaintiff questioned other witnesses in his case-in-chief in a relatively neutral manner regarding their awareness of the Orchard Road project.[4] At all times during the presentation of the evidence where an instruction to the jury was warranted, however, the court carefully reiterated to the jury the fact that the propriety or impropriety of the procedures surrounding the Orchard Road project were not an issue in this case. Moreover, the jury was admonished that it should not interpret defendants' silence on this issue as an admission that there was in fact some type of corruption involved. The substance of these instructions was presented to the jury one final time in the court's final instructions prior to jury deliberations. The jury was not unaware of its obligation in this regard.

The practical result of the court's resolution of these evidentiary pre-trial motions and objections, according to defendants, was a one-sided, selective presentation at trial of the circumstances surrounding the Orchard Road project which went beyond mere "background" and unfairly prejudiced defendants in their presentation of the case. Specifically, defendants argue that the impact of these rulings was to ensure that the jury would infer wrongdoing on the part of the County and, accordingly, rule in favor of Fleming on his first amendment claim.

4. Specifically, Fleming elicited Orchard Road testimony from William Carter, the former Superintendent, as well as Paul Holcomb, Richard Stout, Allen Johnson, and Richard Dencer, co-employees of Fleming at the Highway Department. In none of these instances, however, did the testimony specifically address the actual merits of the Orchard Road project. Finally, Fleming elicited testimony regarding Orchard Road from William Barrett, the State's Attorney assigned to investigate the propriety of the Orchard Road project. The results of Mr. Barrett's Investigative Report—i.e., that there was no wrongdoing in the Orchard Road overpass—were made known to the jury during plaintiff's direct examination of Mr. Barrett. Additionally, the Report itself, although admitted for the limited purpose of showing that an Investigative Report had been undertaken by the State's Attorneys Office, was available to the jury during its deliberations.

■ Our review of the trial court's rulings with regard to the admissibility of this evidence is governed by the "abuse of discretion" standard set forth in *Sherrod v. Berry*, 856 F.2d 802, 804 (7th Cir.1988) (en banc); *United States v. Garver*, 809 F.2d 1291, 1297 (7th Cir.1987). Guided by the deference we are obligated to afford the district judge's evidentiary determination in this regard, we affirm the exclusion of defendants' proffered testimony.

The district judge's motivation, both in his rulings on the parties' pre-trial motions and in his evidentiary rulings and jury instructions during the course of the trial, was to preclude the parties from engaging in a "mini-trial" on the propriety or impropriety of the procedures surrounding the Orchard Road project. He firmly maintained, and both parties concede, that the extent to which Fleming's allegations were true or false did not affect his right under the first amendment to raise those concerns. Thus, the district court's evidentiary rulings were an attempt to focus the jury's attention on that issue which it was obligated to decide—i.e., whether Fleming's termination was motivated by his first amendment activity or whether it was motivated by other constitutionally legitimate considerations.

Defendants argue, however, that this fact by itself does not dispositively address the relevance for which this evidence was submitted. Specifically, defendants maintain that this evidence should have been admitted as probative of Mr. Fakroddin's motivation in firing Mr. Fleming. As hypothesized by the defendants, in the absence of any corruption on the part of the County in letting the Orchard Road project, Mr. Fakroddin could have no motivation to terminate Fleming for this "whistle-blowing" activity.

Addressing the balance that must be struck under Federal Rule of Evidence 403 between the probativeness and prejudicial impact of proffered evidence, we stated, "'the relevant inquiry is whether any *unfair prejudice* from the evidence substantially outweighs its probative value.'" *Cook v. Hoppin*, 783 F.2d 684, 689 (7th Cir.1986) (quoting *United States v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir.), *cert. denied*, 469 U.S. 1028, 105 S.Ct. 448, 83 L.Ed.2d 373 (1984)). We do not question defendants' assertion that this evidence regarding the propriety of the Orchard Road project, although not directly probative of Mr. Fakroddin's motivation in terminating Fleming, may have been at least tangentially relevant. Our review of the transcript, however, persuades us that any potential relevance which this evidence may have had was substantially outweighed by the potential unfair prejudice which it could have had on the jury's perception of Fleming's right to exercise his first amendment right to speak out. This was precisely the concern of the district judge in excluding this evidence. In this regard, we have noted, "[t]he trial court's balancing of probative value and unfair prejudice is highly discretionary and its decision on admissibility will be accorded 'great deference.'" *West v. Love*, 776 F.2d 170, 174 (7th Cir. 1985) (quoting *United States v. Medina*, 755 F.2d 1269, 1274 (7th Cir.1985)). Based on our review of the transcript of the proceedings below and the deference which we owe the district court's balancing of this difficult issue, we conclude that it was not an abuse of discretion to exclude this evidence from trial.

### *Motion for JNOV or, Alternatively, a New Trial.*

■ Defendants maintain that the evidence adduced at trial did not support the verdict in favor of Fleming under the Supreme Court's decision in *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Under *Mt. Healthy*, once Fleming had shown that his conduct was constitutionally protected and that it was a "motivating factor" in defendants' decision to terminate him, the burden shifted to defendants to show that they would have terminated Mr. Fleming even in the absence of his "whistle-blowing" activity. *Id.* at 287, 97 S.Ct. at 576; *Nekolny v. Painter*, 653 F.2d 1164, 1167 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). Pointing to certain derogatory

statements directed by Fleming toward Mr. Fakroddin,[5] defendants argue that they have met their burden with regard to the second prong of the *Mt. Healthy* test. Specifically, defendants argue that in light of these statements, a reasonable juror could not have found that Fleming would not have been discharged even absent his protected speech.

Our review of the trial court's denial of defendants' motions for a JNOV and a new trial requires us to apply two separate standards. With respect to defendants' motion for a JNOV, we have stated:

we must determine *de novo* 'whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in a light most favorable to the party against whom the motion is directed.'

*Cygnar v. City of Chicago,* 865 F.2d 827, 834 (7th Cir.1989) (quoting *Tice v. Lampert Yards, Inc.,* 761 F.2d 1210, 1213 (7th Cir. 1985)); *see also Collins v. State of Illinois,* 830 F.2d 692, 697 (7th Cir.1987). Elaborating on our function in this regard we have noted, "[t]his court will not reweigh or reevaluate the evidence—that task is reserved to the jury as factfinder." *Siddiqi v. Leak,* 880 F.2d 904, 908 (7th Cir.1989).

Our review of the record in this case leads us to affirm the district court's denial of defendants' motion for a JNOV. While we generally agree with the district court's assessment that Fleming's behavior was "reprehensible", we do believe that the record provides substantial evidence in support of Fleming's claim that he was discharged in retaliation for his "whistle-blowing" activity and that his reprehensible behavior would not have otherwise motivated his termination. As in *Collins,* "[a]lthough the jury might have been entitled to decide otherwise, the jury was entitled to find retaliation because we believe there was substantial evidence of retaliation. It was

certainly more than a scintilla." 830 F.2d at 705. Accordingly, we affirm the district court's denial of defendants' motion for a JNOV.

The district court's denial of defendants' motion for a new trial demands a somewhat more exacting standard of review. Under this court's decision in *Cygnar:*

[t]he test to be applied in determining whether a motion for a new trial should be granted is whether 'the verdict is against the weight of the evidence, that the damages were excessive, or that, for other reasons, the trial was not fair to the party moving.'

865 F.2d at 835 (quoting *General Foam Fabricators v. Tenneco Chemicals, Inc.,* 695 F.2d 281, 288 (7th Cir.1982)). Defendants point to each of these factors in support of their motion for a new trial.

Although the evidence presented at trial provided substantial support for both parties' contentions, and although the jury's initial award for emotional distress was determined by the district court to be excessive, we do not believe that these facts warrant our reversal of the district court's denial of defendants' motion for a new trial. As we stated in *Cygnar:*

'[b]ecause the authority to grant a new trial ... is confided almost entirely to the exercise of discretion on the part of the trial court, ... the grant or denial of a motion for a new trial is not subject to review by this court, except upon exceptional circumstances showing a clear abuse of discretion.'

865 F.2d at 835 (quoting *General Foam,* 695 F.2d at 288). At trial, a substantial amount of evidence was presented in support of both parties' contentions. As is evident by the jury's ultimate determination, that which was presented by Mr. Fleming was perceived as the more credible.[6] Based on this fact, and the proper

---

**5.** It is undisputed that Mr. Fleming made the following derogatory statements to Mr. Fakroddin during the relevant period in question:

"You wouldn't make a pimple on an engineer's ass."

"You don't have the guts to fire me."

"This is another instance of you lying to me."

**6.** Although we are not in the business of weighing the credibility of the witnesses, our review of the trial transcript permits us to understand the jury's conclusion. Mr. Fakroddin's testimony was filled with inconsistencies and opportu-

allocation of the roles between the judge and jury in determining the facts, we do not find a "clear abuse of discretion" in the denial of defendants' motion for a new trial and, accordingly, affirm.

### Damages

■ Fleming's final damage award, in the amount of $157,574.19, was comprised of the following elements: $65,516.90 for back pay; $21,767.09 for future lost income; $30,290.20 for lost income from investment earnings; and $40,000 (reduced from $120,000) for emotional distress. Defendants' challenge to the propriety of this damage award raises two arguments. First, defendants argue that the award for "loss of wages"—i.e., the $87,283.99 representing the awards for back pay and future lost income—is against the manifest weight of the evidence. Second, defendants argue that the award of $40,000 for emotional distress, even after the remittitur of $80,000, is "grossly excessive." In reviewing the claim for "loss of wages," we note that we are bound by the district court's determination as to the appropriate amount of damages unless that determination is clearly erroneous. *Donnelly v. Yellow Freight System, Inc.*, 874 F.2d 402, 411 (7th Cir.), *cert. granted in part,* — U.S. —, 110 S.Ct. 363, 107 L.Ed.2d 349 (1989).

■ The substantive law regarding the recovery of lost wages in the employment discrimination context was addressed by this court in *Hanna v. American Motors Corp.*, 724 F.2d 1300 (7th Cir.), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3512, 82 L.Ed.2d 821 (1984). Under that standard, an employee who seeks lost wages for the period of discrimination has the initial burden of establishing the amount of damages.

Once the amount sustained as damages has been established, the burden shifts to the employer to prove, as an affirmative defense, that the employee failed to mitigate those damages. *Id.* at 1306–07. In order to prove a failure on the part of the employee to mitigate, the employer must show that:

(1) the plaintiff *failed to exercise reasonable diligence* to mitigate his damages, and

(2) there was a reasonable likelihood that the plaintiff might have found *comparable work by exercising reasonable diligence.*

*Id.* at 1307 (emphasis in original); *see also United States v. City of Chicago*, 853 F.2d 572, 578 (7th Cir.1988). Defendants' arguments with respect to this portion of the damage award focus on the "mitigation" issue.

■ Defendants argue that the evidence which was presented on their behalf at trial established that Fleming had not sufficiently mitigated his damages. Specifically, defendants point out that during the five year period from the time he was fired in 1984 until he reached the age of 65 in 1989, Fleming contacted only two headhunters: Argonne High Tech in early 1985, and P & I Consulting sometime in 1986. Citing *Hunter v. Allis–Chalmers Corp., Engine Div.*, 797 F.2d 1417 (7th Cir.1986), defendants argue that this showing of "job-hunting effort" cannot serve as sufficient mitigation.[7] Moreover, defendants point out that Fleming turned down "two or three" jobs offered by P & I Consulting. According to Fleming's testimony, one job involved the construction of the "deep tunnel" in Chicago—a project which he testified to "knowing absolutely nothing

---

nities, not lost by plaintiff's counsel, for substantial impeachment. Thus, while we do not purport to determine the credibility of the witnesses, we can understand the jury's apparent resolution of that issue.

7. In *Allis–Chalmers*, the plaintiff, Hunter, was initially awarded $134,000 in back pay for the five-year period between the date he was fired and the date of trial. The evidence showed, however, that during this period, Hunter did not work at all for the first three-and-a-half years,

and thereafter held four jobs, three of which lasted for no more than six weeks and one of which was seasonal. Additionally, the record showed that Hunter had applied to sixteen employers other than those from whom he accepted positions. Based on this record, and other case law, we concluded that the maximum period of unsuccessful search that Hunter could be allowed was three years. Accordingly, the case was remanded to the district court to recompute the back-pay award.

about." The second, although not explicitly described, was located at O'Hare International Airport. Fleming apparently turned this job down because it would entail a lot of driving, and it didn't appeal to him.

Fleming responds that his situation is more analogous to that presented in *Orzel v. City of Wauwatosa Fire Dept.*, 697 F.2d 743 (7th Cir.), *cert. denied*, 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983). In *Orzel*, a 55-year-old plaintiff who had been involuntarily retired secured one part-time job and applied for a separate full-time job during a two-year period, in addition to placing his name on file with the Wisconsin Job Service. We held that, under the circumstances presented, he had not breached his duty to exercise "reasonable diligence" in mitigating his damages.

It is by now well-established that the principle of mitigation of damages requires an injured party, at the risk of having his damage award reduced, to take reasonable steps to minimize the harm done. *See Allis–Chalmers*, 797 F.2d at 1427; Farnsworth, Contracts §§ 12.12 and .13. Fleming's diligence in attempting to secure other employment does not amount to that which we consider "reasonable." Fleming's efforts to secure a new job—e.g., his efforts in contacting two head-hunting firms—occurred within the first two years of his termination. Thereafter, the record indicates that Fleming's only activity in this regard was to turn down two or three jobs which he had been offered. It would be a stretch of this court's precedent to conclude that this activity constitutes "reasonable diligence." As we stated in *Allis–Chalmers*, "[y]ou cannot just leave the labor force after being wrongfully discharged, in the hope of someday being made whole by a judgment at law." 797 F.2d at 1428. In light of the less than vigorous nature of Fleming's attempt to secure other employment, and in view of our prior case law on this subject, we conclude that the district court's award of back pay for the entire five-year period prior to Fleming's date of retirement was clearly erroneous. Accordingly, we reduce Fleming's award for loss of future wages to an amount which compensates him for the period covering only the three years immediately following his termination. This period appears to be the span of time during which Fleming's efforts to secure new employment could be described as "reasonable." *Cf. Allis–Chalmers*, 797 F.2d at 1428. This portion of the damages award is remanded for computation in line with this opinion.

■ As compensation for emotional distress, the jury awarded Fleming $120,000. Pursuant to defendants' post-trial motion for a JNOV or, alternatively, a new trial, the district court gave Fleming the option of accepting a remittitur from that award in the amount of $80,000, or a new trial on the damages issue. Fleming accepted the remittitur. In this portion of their challenge to the damage award, defendants maintain that the award for emotional distress, even as reduced to $40,000, is "grossly excessive."

The standard for reviewing the dollar amount of this type of jury award has recently undergone some change. Under our traditional standard, only in those circumstances where the jury damage award is " 'monstrously excessive,' a product of passion and prejudice, or if there is no rational connection between it and the evidence, may the trial court disturb it." *Cygnar*, 865 F.2d at 847. As an additional consideration, however, we have further noted that we must examine compatibility among such awards—i.e., whether the award is out of line with other awards in similar cases. *See Id.* at 848; *In re Innovative Constr. Systems*, 793 F.2d 875, 887 n. 11 (7th Cir.1986); *Joan W. v. City of Chicago*, 771 F.2d 1020, 1023 (7th Cir.1985). Finally, the district court in this case granted defendants' motion for a new trial on this issue with the option for Mr. Fleming to accept a remittitur in the amount of $80,000. Under this factual scenario, "a somewhat more exacting standard of appellate review should apply." *Cygnar*, 865 F.2d at 848. Our review of the record in this case, together with our review of amounts awarded in other similar cases, persuades us that the final award of $40,-

000 is not "grossly excessive" and does fall within the range of reasonable damage awards under these circumstances.

The record in this case does show a rational connection between the evidence and the damage award. During the course of the trial, the jury heard evidence describing Fleming's humiliation at being subjected to defendants' adopted course of "progressive discipline." Specifically, Fleming testified to his embarrassment and humiliation at being reprimanded in front of his fellow employees, some of whom he had worked with for many years. Moreover, he testified to certain depression he suffered during the period in question, as well as to serious headaches and sleeplessness. Finally, this testimony as to his physical and emotional condition was supported by testimony from his wife and a fellow department employee. The testimony of Dr. Thomas A. O'Shea, Fleming's personal physician, indicates that the job stress which Fleming experienced during this period may have resulted in an aggravation of his physical condition. Dr. O'Shea, however, declined to comment specifically on his emotional condition. In light of all this evidence, we cannot conclude that the award of $40,000 was unsupported by the evidence. *Compare Nekolny v. Painter*, 653 F.2d 1164 (7th Cir.1981).

Thus, the propriety of this damage award hinges on the compatibility of this award to awards which have been given in other similar cases. With regard to this aspect of our review:

> [t]he trial court's superior position in regard to a particular jury award does not help achieve roughly uniform damages awards in cases involving very similar facts. Therefore, traditional notions of deference do not carry as much weight and an appellate court may properly exercise more control over the size of damage awards in such cases.

*In re Innovative Constr. Systems*, 793 F.2d at 887 n. 11. Even with this added degree of discretion, however, we conclude that this award is not incompatible with that range which has been awarded in other similar cases. In *Webb v. City of Chester*, 813 F.2d 824 (7th Cir.1987), we examined a variety of cases, both from this circuit and others, in which plaintiffs who had been fired pursued their legal remedies under §§ 1981 or 1983.[8] Our review of those cases led us to the conclusion that damage awards in this context have ranged from $500 to over $50,000. Mr. Fleming was awarded $40,000 for emotional distress. Although this award falls within the upper limits of that range, we do not conclude that it is out of line with other cases in similar contexts. *See, e.g., Ramsey v. American Air Filter Co., Inc.*, 772 F.2d 1303, 1313 (7th Cir.1985) ($35,000 was determined to be outermost award that could be supported by the record in § 1981 race discrimination case). Accordingly, we affirm the district judge's award of $40,000.

*Attorney's Fees*

On December 1, 1987, attorneys for Mr. Fleming filed their Motion for Costs Including Attorney's Fees under § 1988 for a "lodestar amount" of $232,403.75. In a Memorandum Opinion and Order dated April 12, 1988, the district court ruled that plaintiff was entitled to attorney's fees under § 1988, but did not rule on the exact amount to be awarded. Rather, the court's discussion was limited to preliminary findings. As to the "hourly rates" that could appropriately be assessed for each attorney's time, the court indicated that neither "historical billing rates" nor pure "current billing rates" could properly serve as a fair measure of "reasonable attorneys fees" under § 1988. The district court's concern was to compensate plaintiff's attorneys for the delay they had experienced in collecting their fees. With this concern in mind, the court concluded that: (1) the actual regular billing rates for each of Fleming's lawyers at the respective times the services were rendered would serve as the reasonable prevailing rates for those lawyers; and (2) adjustment to those rates would take the form of adding interest at the prime rate from a date 30 days after the end of the month in which the services were rendered.

---

**8.** *See* 813 F.2d at 836 n. 3 and cases cited therein.

With regard to the number of hours claimed by plaintiff's counsel, the court indicated that defendants' objections were well-founded and urged counsel to independently resolve their discrepancies over this amount.

After counsel had failed to independently resolve their disputes over the fee issue, plaintiff submitted a Supplement to Motion for Costs Including Attorneys Fees in which the amount prayed for was reduced to $205,176.80. This reduction was the result of a number of factors. First, plaintiff's counsel made adjustments to the hourly rates. The newly proposed rates reflected the attorneys' actual billing rates at the respective times at which each particular service was rendered. Plaintiff's counsel also made significant reductions in the "time spent" attempting to accommodate defendants' objections to their original submissions.[9] In their Response to Plaintiff's Supplement, defendants renewed their objections to the number of hours claimed, contested plaintiff's use of the "adjusted hourly rates," and objected to the award of any interest on the unpaid attorney's fees. After a hearing in which each of these issues was discussed, the court, without further explanation, entered a Minute Order on June 23, 1988, allowing $205,176.80 to plaintiff as attorney's fees and costs. Defendants appeal from this final order.

■ Defendants arguments with respect to the award of attorney's fees are threefold. Initially, defendants argue that plaintiff's attorneys waived their right to receive interest on the fees award in that they did not include this amount in their original fee petition. Defendants present, and we have been able to find, no authority in support of this proposition. Second, de-

fendants argue that the award of attorney's fees was excessive. Finally, defendants point to the one-page Minute Order of June 23, 1988, and argue that the district court's lack of explanation as to why plaintiff's calculation of the fees amount was chosen over that of defendants necessitates a remand on this issue for an explanation.

■ We address defendants' third argument first. In *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983), the Court stated that a district court must provide "a concise but clear explanation of its reasons for the fee award." *See also Lenard v. Argento,* 808 F.2d 1242, 1247 (7th Cir.1987) (substantial fees awards cannot be supported by a one-page opinion that announces only conclusions rather than providing reasons for those conclusions). The district court's final order of June 23rd awarding $205,706.80 provides no explanation. It is true, as plaintiff points out, that the April 12th Memorandum Opinion and Order provides a lengthy discussion by the district judge regarding his initial thoughts on the fees issue. It does not, however, provide a clear and concise explanation as to why plaintiff's calculations were adopted over those of defendants. Indeed, the content of this Order indicates that the court, at least initially, found some of defendants' objections to have merit, particularly those concerning the disputed number of hours claimed by plaintiff's counsel. Based on the confusion which is described in footnote 9, *supra,* it is also apparent that defendants did not intend to withdraw those objections as the district judge had assumed. Thus, to the extent the final award of attorney's fees mirrors that which was prayed for in Plaintiff's Supplement (as it does here), it is

9. It is unclear whether these reductions in hours appeased defendants' concerns in this regard. In the June 23, 1988 status hearing, the district judge indicated that he believed that the defendants no longer had any objections to the hours as they had been refined. The district judge apparently based this assumption upon the following language found in defendants' response to plaintiff's supplement—"Defendants state that they have no objection to the hours of work reflected in the May 2 and June 3, 1988 state-

ments, attached as Exhibit 'E' to the Plaintiff's Supplement." Defendants argue that this was not a withdrawal of any objections they previously had to the number of hours claimed by plaintiff. Rather, defendants maintain that the impact of this language was simply to provide a written waiver of objections to the hours worked by plaintiff's counsel *after* their submission of the original Fee Petition. Thus, it appears that there is still a dispute over the number of hours initially claimed.

necessary for the district judge to provide an explanation as to why he chose plaintiff's calculations as to the appropriate fee over those of defendants.[10] Accordingly, we remand for this purpose.

In remanding this issue to the district court, we think it appropriate to provide guidance as to defendants' contentions in their second argument. Initially, defendants argue that the award of interest should not be at the prime rate, but rather at some lower rate. Second, defendants argue that any interest awarded should only run from June 24, 1988, the date the judgment awarding interest was rendered. We will address each of these contentions in turn.

### A. Award of Interest at the Prime Rate

As a result of the fee arrangement under which plaintiff's attorneys obligated themselves to work, they have yet to receive a portion of their attorney's fees.[11] Although Fleming agreed to pay his attorneys on an hourly basis, his attorneys assumed a certain "risk of loss" by agreeing to represent him at a rate lower than their usual billing rate. By virtue of this arrangement, plaintiff's attorneys placed themselves in a position similar to that occupied by attorneys who accept representation on a contingency basis. It is apparent from the district court's Memorandum Opinion and Order of April 12th, however, that the addition of interest to the lodestar amount was not an attempt to compensate

plaintiff's attorneys for the limited "risk of loss" which they assumed in this representation. Rather, the district judge's concern was to compensate plaintiff's attorneys for the delay they have experienced in collecting their full fees—i.e., to compensate them for inflation and the time value of money.

■ This court, as well as others, has recognized that when attorneys experience a delay in receiving their fees, the fee award should compensate them for inflation. *Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 776 F.2d 646, 660 (7th Cir. 1985). More specifically, this court has recognized that "a district court may compensate for delay by a computation of interest, a percentage allowance for inflation, or a similar allowance in choosing a 'so-called multiplier.'" *Id.* at 663; *see also Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 764 n. 6 (7th Cir.1982), *cert. denied*, 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). Finally, we have recognized that "[t]he determination of what constitutes reasonable attorneys' fees lies in the sound discretion of the district court, and we will disturb the district court award only for an abuse of that discretion." *Ohio–Sealy*, 776 F.2d at 650; *see also Illinois v. Sangamo Construction Co.*, 657 F.2d 855, 862 (7th Cir.1981).

In light of this precedent, it was clearly not an abuse of discretion on the part of the district court to attempt to compensate plaintiff's attorneys for the delay by applying an interest rate to the lodestar amount.[12] Defendants argued in their re-

**10.** In their response to Plaintiff's Supplement, defendants provided various computations of what might be an appropriate fees award in the event that any or all of their objections were sustained. These figures range from $127,-391.25 to $179,383.44. Thus, without the benefit of explanation, the June 23rd Order of the district court obligated defendants to pay between $25,793.36 and $77,785.55 over that which they feel obligated to pay under their own calculations.

**11.** The fee arrangement in force between Fleming and his attorneys provides, in pertinent part: The fee basis shall be hourly, with attorney time to be billed at a flat rate of $20.00 per hour, that being one-fourth of the primary attorney's customary billing rate. It is agreed and understood that if I prevail upon my civil

rights claim(s), my attorneys will apply to the court for an award of costs including attorney's fees under 42 U.S.C. § 1988. Upon receipt of any such award, they will reimburse me therefrom for the amount of fees and costs I shall then have paid to the Firm in connection with this matter ... I understand ... and state that the foregoing arrangement is in consideration of the Firm's undertaking to represent me in same and is intended to provide partial compensation to the Firm for its service during the course of said matter.

**12.** In *Ohio–Sealy,* a case in which the arrangement between the parties called for payment on an hourly basis, we stated, "[t]he interest rate approach is not appropriate here since the plaintiff paid its lawyers on an hourly basis...." 776 F.2d at 663 n. 17. The unique

ply to plaintiff's supplement, and continue to argue in this appeal, however, that the application of the prime rate of interest is excessive. If interest is to be allowed on the unpaid attorney's fees, defendants maintain that a lower rate such as the rate for Treasury Bills or One–Year Certificates of Deposit should be applied.

In light of the broad discretion to be afforded the district court in determining what constitutes a "reasonable attorney's fee," we cannot conclude that the application of interest at the prime rate was an abuse of discretion. Nonetheless, the district court's obligation to provide an explanation as to why it chose the prime rate over those advocated by defendants has not been satisfied in this case. Because of the lack of explanation regarding the rate chosen, our remand in this case includes instructions to address this issue.

**B. Date at Which Interest Begins to Accrue**

■ In the Memorandum Opinion and Order of April 12th, the district judge directed that interest should be added to the lodestar figure "from a date 30 days after the end of the month in which the services were rendered" through October 22, 1987, the date on which judgment was entered on the jury's initial verdict as to liability. This application of interest is inappropriate.

As we have noted, "plaintiffs may collect interest on attorney's fees or costs only from the date that the award was entered." *Ohio–Sealy,* 776 F.2d at 662. Prior to the date the judgment on attorney's fees was entered, plaintiff's attorneys' claim for unpaid attorney's fees was unliquidated and, as such, not entitled to interest. *Perkins v. Standard Oil Co. of Cal.,* 487 F.2d 672, 675 (9th Cir.1973); *see also In re Burlington Northern, Inc. Employment Practices Litigation,* 810 F.2d 601, 609 (7th Cir.1986), *cert. denied,* 484 U.S. 821, 108 S.Ct. 82, 98

L.Ed.2d 44 (1987) (under 28 U.S.C. § 1961(a), the statutory presumption is that interest on money judgments "shall be calculated from the date of the entry of the judgment"). In this case, the record clearly indicates that the award of attorney's fees was entered on June 24, 1988. Accordingly, interest will be allowed on the amount awarded as attorney's fees only from June 24, 1988 until the date the judgment is paid.

*Conclusion*

For the foregoing reasons, we AFFIRM the district court's exclusion of the Orchard Road evidence, we AFFIRM the district court's denial of defendants motions for a JNOV or, alternatively, a new trial, we REMAND the award for "loss of wages" to the district court for computations consistent with this opinion, we AFFIRM the district court's award of damages for emotional distress, and we REMAND the determination of attorney's fees to the district court with instructions.

---

nature of the fee arrangement between Fleming and his lawyers distinguishes this case from *Ohio–Sealy,* however, in one very important respect. In *Ohio–Sealy,* the lawyers worked on an hourly basis and, according to the panel authoring that opinion, experienced no delay in receiving their payments. Thus, they were in posses-

sion of the money in question and there was no reason to attempt to compensate them for the loss of use of that money. Under the facts of the case at bar, however, plaintiff's attorneys have not received all of their attorney's fees and, as such, it is appropriate to attempt to compensate them for the loss of use of that money.