**Thomas MAHONEY, Plaintiff,**

v.

**Russell KESERY, et al., Defendants.**

**No. 90–C–224.**

United States District Court,
E.D. Wisconsin.

July 18, 1991.

Sharon Sullivan, Chicago, Ill., for plaintiff.

Grant F. Langley, City Atty. by Scott G. Thomas, Asst. City Atty., Milwaukee, Wis., for defendant Kesery.

Robert G. Ott, Corp. Counsel by Mary Ellen Poulos, Asst. Corp. Counsel, Milwaukee, Wis., for defendant Smith.

## DECISION AND ORDER

MYRON L. GORDON, District Judge.

On March 5, 1990, the plaintiff, Thomas Mahoney, filed this civil rights action against defendants Russell Kesery, a Milwaukee city police officer, and Mary Anne Smith, a Milwaukee county assistant district attorney. Mr. Mahoney charged that he was arrested without probable cause and maliciously prosecuted in violation of his constitutional rights and § 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983. On May 9, 1991, a jury trial of the action was commenced.

During the trial, the court granted defendant Smith's motion for a directed verdict based upon her defense of absolute immunity. Ultimately, the jury returned a verdict in favor of the plaintiff and against Officer Kesery, the remaining defendant. The jury awarded the plaintiff damages in the sum of $20,000, and the court directed the entry of judgment in that amount. Officer Kesery has now filed a motion for a judgment notwithstanding the verdict pursuant to Rule 50(b), Federal Rules of Civil Procedure, and a motion for a new trial pursuant to Rule 59, Federal Rules of Civil Procedure. The motions will be denied.

### I.

In November 1986, when the incident giving rise to the action occurred, the plaintiff, Thomas Mahoney, was a student at Marquette University. The plaintiff lived with four other Marquette students in a house located in the city of Milwaukee at 2221 West Wells Street. On the evening of November 22, 1986, the plaintiff and his

housemates were hosting a beer party. During the party, the plaintiff and others became aware that a half-barrel (keg) of beer had been stolen from their front porch. The plaintiff testified that when he learned of the theft he went out onto the street, spotted two persons some distance away carrying a keg, and gave chase. He further testified that when he approached the culprits and called out to them, one dropped the keg and ran; the other, unsuccessful in his attempt to carry the keg alone, soon did the same. The plaintiff further testified that he then picked up the keg, mounted it on his back, and, later with the assistance of another student, set about carrying it back to the party. It was the plaintiff's testimony that he saw nothing more of the two persons from whom he had recaptured the beer keg, and that he simply returned to the party.

At trial, the evidence showed that the two young men who had stolen the keg were beaten, one severely injured, by a band of Marquette students who apparently sought greater retribution than the return of the beer keg to its owners. There was evidence that the beatings were witnessed by upwards of thirty persons. The theft of the keg, for which no criminal charges were ever filed, soon became a minor event in comparison to the beatings, for which the Milwaukee city police almost immediately began an investigation.

The day after the party, Milwaukee city police officers appeared at the house Mr. Mahoney shared to question its occupants about the beatings. On December 5, 1986, the officers reappeared at the house. Officer Gary Temp testified that, after notifying the plaintiff of his constitutional rights, he further questioned the plaintiff about his knowledge of the beatings. Officer Temp testified that at some point in his discussion with the plaintiff, he asked the plaintiff something to this effect: "So you're telling me that you stayed upstairs drinking with a buddy and never left the house last night?" Officer Temp testified that the plaintiff's response was "No." The plaintiff's testimony and that of Officer Temp were not literally in sharp dispute on the words used. Notably, the specifics

of this colloquy were not mentioned in Officer Temp's police report. Plaintiff's Exhibit # 1–A (hereafter referred to as "PX # _____").

Officer Temp testified that he later discussed the plaintiff's conduct with one of the defendants, Officer Russell Kesery. Officer Kesery was in the process of conducting an extensive investigation of the beatings. The evidence at trial demonstrated that Officer Kesery was a thorough investigator: during his investigation, he interviewed approximately 45 persons, mostly Marquette students and meticulously recorded his personal observations in a series of police reports (PX # 1) and in his personal log books (PX # 7). Officer Kesery's police reports, which primarily consist of the statements of well over thirty students who were at the party but, remarkably, knew nothing of the beatings, strongly suggest that a "wall of silence" had been erected. Both Officer Kesery and Officer Temp testified that they believed the students were intentionally attempting to frustrate the police investigation.

Officer Kesery later made a direct inquiry of the plaintiff. True to the "wall of silence," the plaintiff declined to answer and referred Mr. Kesery to the plaintiff's father. The plaintiff's father, Patrick E. Mahoney, is an attorney—and testified that he made that fact clear to Officer Kesery during their initial telephone conversation. The testimony at trial also disclosed that the conversation between Officer Kesery and the plaintiff's father grew antagonistic. Patrick Mahoney testified that by the end of that conversation, Officer Kesery was seeking his social security number, presumably as a veiled threat of some sort of official action. The officer's difficulty breaking the wall of silence despite extensive interviews, coupled with Patrick Mahoney's hard attitude, may have aggravated Mr. Kesery's frustration with the case.

The plaintiff's ambiguous denial of Officer Temp's ambiguous question came to be recorded in one of Officer Kesery's log books as follows: "Mahoney by Temp: I was up in a bedroom w/a buddy drinking and I never left the house." Eventually,

this came to be viewed by the state prosecutors as criminal conduct. Officer Kesery and Assistant District Attorney Smith alerted the plaintiff of this development when they jointly interviewed him on February 16, 1987.

On March 3, 1987, the plaintiff was named in a criminal complaint charging him with obstructing an officer in the conduct of his duty in violation of Wis.Stat. § 946.41(1). On March 5, 1987, a court commissioner reviewed the criminal complaint and made a finding of probable cause for arrest. On April 29, 1987, the plaintiff voluntarily appeared for arrest and was "booked"—searched, fingerprinted and photographed. However, on August 4, 1987, the eve of trial, the charges were dismissed on the motion of the assistant district attorney.

The plaintiff subsequently filed this civil rights action against Officer Kesery and Assistant District Attorney Smith. At trial, defendant Smith was dismissed from the action. The jury found that the plaintiff had been arrested without probable cause and maliciously prosecuted by Officer Kesery in violation of his constitutional rights and 42 U.S.C. § 1983. The jury awarded the plaintiff compensatory damages in the amount of $20,000.

## II.

Officer Kesery raises two specific challenges in his motion for a judgment notwithstanding the verdict: that the evidence was insufficient to support the jury's verdict, and that he is entitled to a judgment as a matter of law under the doctrine of qualified immunity.

## A.

■ Where based upon a challenge of the evidentiary basis for the verdict, a motion for a judgment notwithstanding the verdict must be denied if "the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in a light most favorable to the party against whom the motion is directed." *Fleming v. County of Kane*, 898

F.2d 553, 559 (7th Cir.1989) (*quoting Cygnar v. City of Chicago*, 865 F.2d 827, 834 (7th Cir.1989) (further quotation omitted)). The court is not permitted to "resolve conflicts in testimony, or weigh and evaluate the evidence." *Cygnar v. City of Chicago*, 865 F.2d 827, 834 (7th Cir.1989) (*citing Anderson v. Gutschenritter*, 836 F.2d 346, 348 (7th Cir.1988)).

There is no dispute that the plaintiff was arrested and prosecuted for obstructing Officer Temp in his investigation. However, there are some questions as to whether the plaintiff's conduct was obstructive at all. Specifically, there is a question as to whether the plaintiff's allegedly obstructive "no" response to Officer Temp question was directed to the "So you're telling me ...?" part of the inartfully cast question or the "... you stayed upstairs drinking with a buddy and never left the house last night?" part of the question.

The gist of the plaintiff's case was that Officer Kesery intentionally misconstrued his response to Officer Temp and improperly used it as the basis of a criminal prosecution. The plaintiff claimed that his response was insignificant, and that his conduct simply was not criminal. He suggested that Officer Kesery was improperly using him as an example—as a battering ram against the "wall of silence" then frustrating the investigation of the beatings. That a "wall of silence" existed is highly probable. Indeed, throughout his testimony, the plaintiff demonstrated this when he steadfastly, and perhaps beyond the limits of credulity, maintained that he knew nothing of the beatings when questioned by Officer Temp; skillful cross-examination by Officer Kesery's attorney suggested that it would have been difficult for the plaintiff *not* to have been a witness to the beatings.

On the other hand, the plaintiff made much of the fact that the statement Officer Temp attributed to him did not appear in Officer Temp's contemporaneous police report or in Officer Kesery's log book for the relevant time period—November/December 1986. In fact, it did not appear "within" any of Officer Kesery's log books. It appeared on the back-page "scratch area"

of a log book used by Officer Kesery sometime in 1987. From these facts, the plaintiff suggested that improper police conduct was underfoot—namely that Officer Kesery had "planted" the statement in his log book after the fact. The plaintiff's endeavor to show malicious motives on the part of Officer Kesery also included a suggestion that the plaintiff's arrest and prosecution were motivated by Officer Kesery's less than profitable discussion with the plaintiff's attorney-father.

At bottom, the case turned upon the jury's assessment of the credibility of three important witnesses, each of whom testified at trial: the plaintiff, Officer Temp, and Officer Kesery. The jury's verdict reflects a considered judgment that it was the plaintiff who had told the truth and the police officers who had not. Implicit in the jury's verdict is a suggestion that the plaintiff had obstructed nothing—that Officer Kesery simply made up the case against the plaintiff.

Having reviewed the evidence in the light most favorable to the plaintiff, the court finds it to support the jury's finding that Officer Kesery's decision to arrest and prosecute the plaintiff was unsubstantiated by probable cause and motivated by malice or vindictiveness.

### B.

Officer Kesery has renewed his contention (also raised during trial on his motion for a directed verdict) that he is entitled to qualified immunity, citing *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and some of its progeny. The question of qualified immunity requires a legal determination by the court, *see Rakovich v. Wade*, 850 F.2d 1180, 1201–02 (7th Cir.) (en banc), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). In conformity with the procedure approved in *Jones v. City of Chicago*, 856 F.2d 985, 994–95 (7th Cir.1988), the court submitted the probable cause and malicious prosecution questions to the jury and reserved its legal determination on the immunity question.

"Qualified immunity is designed to shield from civil liability 'all but the plainly incompetent or those who knowingly violate the law.'" *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir.1989) (*quoting Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)), *cert. denied sub nom.*, *Hughes v. Buss*, —— U.S. ——, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990). Under *Harlow*, a police officer's qualified immunity from constitutional tort liability is forfeited upon "a showing that he was violating an established constitutional principle," *see Jones*, 856 F.2d at 994.

In this case, whether Officer Kesery's immunity defense can be sustained turns on whether "a reasonably well-trained officer in his position would have known" that the facts did not establish probable cause for arrest. *Jones*, 856 F.2d at 993–94 (brackets omitted) (*quoting Malley v. Briggs*, 475 U.S. 335, 345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986)). If "no reasonable officer could have believed that he had probable cause to arrest [the plaintiff]," then Officer Kesery has no recourse to his qualified immunity defense. *Jones*, 856 F.2d at 994; *see also Simkunas v. Tardi*, 930 F.2d 1287, 1291 (7th Cir.1991) (question is whether police officers of reasonable competence could disagree on the existence of probable cause to arrest).

The constitutional principles underlying arrests without probable cause and malicious prosecutions were well-established when the events took place in 1986 and 1987. Moreover, the court has no occasion to question Officer Kesery's basic competence. The next question is whether Officer Kesery knowingly violated the law. The jury found that he did—they concluded that the arrest was made without probable cause in violation of the fourth amendment. As the jury was instructed, probable cause exists if facts and circumstances warrant a belief that a crime has been committed. It is implicit in the jury's verdict that they believed that Officer Kesery had no legitimate reason to conclude that the plaintiff had committed a crime. They further found that Officer Kesery's decision to prosecute the plaintiff was motivated by malice, in violation of the plaintiff's consti-

tutional right to due process of law. Having reviewed the evidence, I hold that the jury's findings on these factual matters cannot be disturbed.

A police officer who arrests and prosecutes a person without probable cause may be shielded from civil liability if a reasonable officer would have done the same thing under the circumstances, *see Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1986). Having examined the circumstances, the court is confident that a reasonable police officer—perhaps one not burdened with the unique frustrations then facing Officer Kesery—would have declined the temptation to arrest and prosecute the plaintiff on such a flimsy charge. Accordingly, the court is constrained to conclude that Officer Kesery's qualified immunity defense cannot be sustained.

### III.

Officer Kesery raises three specific challenges in his motion for a new trial: that the court erred in submitting the plaintiff's malicious prosecution claim to the jury, that the verdict is against the weight of the evidence, and that the damages are excessive.

### A.

Following the presentation of evidence, the jury was instructed and asked to return a verdict on two theories of liability: arrest without probable cause and malicious prosecution. A person who has been arrested without probable cause may seek redress under 42 U.S.C. § 1983, *see, e.g., Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988). Officer Kesery has not challenged the legal basis for that claim. On the other hand, Officer Kesery *has* challenged the legal basis for the plaintiff's § 1983 claim for malicious prosecution.

Insofar as Officer Kesery suggests that the ordinary tort of malicious prosecution actionable under state law is not coextensive with the constitutional tort of malicious prosecution actionable under § 1983, the court fully agrees. (The plaintiff made no effort to comply with the provisions of a

Wisconsin statute authorizing such a *state law* claim against the city, *see* Wis.Stat. § 893.90.) But that is not to say that a claim of malicious prosecution has no basis under § 1983.

The court of appeals for the seventh circuit has recognized that the constitutional tort of malicious prosecution arises when there has been a deprivation of "constitutional magnitude." *Hampton v. Hanrahan*, 600 F.2d 600, 625 (7th Cir.1979), *rev'd on other grounds*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (per curiam); *Easter House v. Felder*, 852 F.2d 901, 910 (7th Cir.1988), *rev'd on other grounds*, 910 F.2d 1387 (7th Cir.1990) (en banc). *See also Smith v. City of Chicago*, 913 F.2d 469, 473 (7th Cir.1990) (acknowledging the existence of a § 1983 claim for malicious prosecution), *cert. denied*, — U.S. —, 111 S.Ct. 2824, 115 L.Ed.2d 994 (1991); *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir.1989) (same). This constitutional tort is rooted in the due process clauses of the fifth and fourteenth amendments. *See Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir.1988) ("at some point after a person is arrested, the question whether his continued confinement or prosecution is unconstitutional passes over from the Fourth Amendment to the due process clause"). *Cf. Terket v. Lund*, 623 F.2d 29, 31 (7th Cir.1980) (§ 1983 complaint construed to allege a deprivation of liberty without due process by malicious prosecution).

There is no question that the plaintiff's two asserted § 1983 theories of recovery are closely related: a § 1983 claim for malicious prosecution cannot be sustained, irrespective of evidence of any malicious motives, if there was probable cause for the arrest. *Mark v. Furay*, 769 F.2d 1266, 1269 (7th Cir.1985). In this case, the existence of probable cause was a live jury issue—one which was decided adversely to Officer Kesery. As the jury was instructed (and it was the substance of Officer Kesery's proposed instruction that was given), the plaintiff had to prove an additional element to prevail on his malicious prosecution claim: that Officer Kesery initiated

the prosecution with a malicious intent. This, too, was a live jury issue.

■ Thus, the propriety of the court's decision to submit the malicious prosecution claim to the jury depends upon whether the plaintiff suffered a deprivation of "constitutional magnitude." This is a close question. The facts showed that the plaintiff was charged with a serious offense. The plaintiff testified that he was obligated to pay $2,500 to defend the charge. He further testified that he was summoned to the police station and booked. Even though he was ultimately successful in his defense (insofar as the charge was dropped), he now has a permanent, if illegitimate, arrest record. While it is true that the plaintiff was never jailed, he testified that his arrest record has had other collateral consequences. Moreover, as he has in the past, the plaintiff will be obliged to recall his arrest whenever he seeks employment or, for that matter, if he again comes within the scrutiny of law enforcement officers.

The existence of evidence demonstrating that the plaintiff was illegitimately burdened with having to fund a criminal defense and with the associated collateral consequences and stigma of an arrest record convinced me that the deprivation was of "constitutional magnitude." I remain persuaded that the submission of the malicious prosecution claim to the jury was proper on the factual record presented in this case.

### B.

Officer Kesery's other two challenges fall within the established rule that a motion for a new trial should be granted only if "the verdict is against the weight of the evidence, ... the damages were excessive, or ... for other reasons, the trial was not fair to the [movant]." *Fleming v. County of Kane*, 898 F.2d 553, 559 (7th Cir.1989) (*quoting Cygnar v. City of Chicago*, 865 F.2d 827, 834 (7th Cir.1989) (quotation omitted)).

The court has already examined the evidence in detail in connection with Officer Kesery's motion for a judgment notwithstanding the verdict, so little further review is necessary. As shown, there was much conflicting testimony and many conflicting explanations of the events—but there was *weighty* evidence on *each* side of the conflict. Ultimately, the jury accepted the plaintiff's version of events over Officer Kesery's version of events. I conclude that the jury's verdict is not against the weight of the evidence.

■ Similarly, the court has no occasion to label as "excessive" the jury's $20,000 damage award. It is true that the plaintiff complained of little more than the fact that he now has an arrest record, and any stigma that accompanies it. It is also true that the only pecuniary loss suffered by the plaintiff was the $2,500 he expended for legal fees in defense of the criminal charge. Accordingly, the court has carefully examined the relationship between the evidence and the amount awarded by the verdict. Upon examination of the evidence, the court believes that the jury could very well have determined that $20,000 would do no more than fairly and reasonably compensate the plaintiff for his embarrassment, anxiety, and pecuniary loss.

The last area of inquiry is whether the trial was fair; I find no basis for believing it was anything but fair.

### IV.

■ As a final matter, the court will address the matter of the plaintiff's entitlement to attorney's fees. Under 42 U.S.C. § 1988, "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." The "prevailing party" in a 42 U.S.C. § 1983 action "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Blanchard v. Bergeron*, 489 U.S. 87, 89 n. 1, 109 S.Ct. 939, 942, n. 1, 103 L.Ed.2d 67 (1989) (*quoting Newman v. Piggie Park Enterprises, Inc.* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968)). That is to say, the discretion accorded the court under § 1988 is "not without limit."

*Blanchard,* 489 U.S. at 89 n. 1, 109 S.Ct. at 942, n. 1; *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983).

The plaintiff is the "prevailing party" on at least a portion of his claims in this 42 U.S.C. § 1983 action. That is, the plaintiff prevailed on both claims he asserted against defendant Kesery, although defendant Smith prevailed on the claims the plaintiff had asserted against her. Although the plaintiff has not yet filed an application for attorney's fees, the court finds the circumstances call for it to examine and resolve on its own initiative the plaintiff's entitlement to attorney's fees.

Until the action was called for trial on Monday, May 6, 1991, the plaintiff was represented by his father, Patrick Mahoney. He was opposed by Milwaukee Assistant City Attorney, Scott Thomas, who skillfully, if unsuccessfully, represented defendant Kesery, and Milwaukee County Principal Assistant Corporation Counsel, Mary Ellen Poulos, who successfully represented defendant Smith. In open court, before jury selection for the trial, Mr. Mahoney, who filed the action on behalf of his son in the first instance, notified the court that he would no longer be representing his son in the action because he learned that the defendants planned to call him as a witness in the case, *see* Rule 3.7, Model Rules of Professional Conduct. (Interestingly, it was only the *plaintiff* who called Mr. Mahoney to testify.) Mr. Mahoney later made a motion for the admission of Ms. Sharon Sullivan to this court, pro hac vice. He then gave way to Ms. Sullivan, who participated in the selection of a jury panel and represented the plaintiff at trial completely on her own. Notably, Ms. Sullivan represented to the court that she had been retained only the Friday before the trial was scheduled to begin. Unfortunately, the conduct of Patrick Mahoney fell below the acceptable standard of practice before this court. Mr. Mahoney had been admitted to practice before this court and, therefore, must be charged with knowledge of its local rules and court procedures. According to the records of the clerk of court, Mr. Mahoney has *twice*—in 1974 and inexplicably again in 1990—been admitted to the bar of this court. Nevertheless, Mr. Mahoney failed to appear at a September 4, 1990, status conference, which triggered the dismissal of the action, and burdened the court with reinstating the action and rescheduling the status conference. In addition, Mr. Mahoney continued to sign various motions, pleadings and papers after he had represented to the court that he had withdrawn as counsel of record. More serious was Mr. Mahoney's flagrant disregard of the court's request (while he was still counsel of record) that he prepare a pretrial report jointly with the defendants' counsel.

By letter of April 23, 1991, the court requested that the parties meet and prepare a joint pre-trial report. The *joint* pretrial report contemplated by the court's request never came into existence. In its letter, the court directed Mr. Mahoney to arrange a meeting of counsel. When the court explored the matter at trial, it learned that he did not arrange such a meeting; moreover, he did not participate in the preparation of the report. Mr. Mahoney left the task to Mr. Thomas and Ms. Poulos. They told the court that they made several telephone calls to Attorney Mahoney's office prior to the due date for the report; the calls largely went unreturned. As the due date for the report drew near, Mr. Thomas and Ms. Poulos believed that they had no choice but to prepare the "joint" pre-trial report without Mr. Mahoney's assistance. That is, Mr. Thomas and Ms. Poulos eventually took the initiative of preparing a report without the timely assistance of Mr. Mahoney. Mr. Mahoney's disregard of his obligations pursuant to the court's pre-trial letter unnecessarily burdened the court and unfairly burdened opposing counsel.

At trial, Mr. Mahoney's statements and conduct led the court to believe that he had withdrawn from the representation. The court disclosed to Ms. Sullivan, and later to Mr. Mahoney, that this was its understanding of the arrangement. Mr. Mahoney now suggests that the court's difficulty with his continuing to appear on mo-

tions, pleadings and papers on behalf of the plaintiff after he had withdrawn from the case is the product of a misunderstanding—that he had *not* withdrawn. At *trial,* Mr. Mahoney made no attempt to alert the court of his differing understanding of the effect of his representations to the court. A review of subsequent correspondence discloses that Mr. Thomas and Ms. Poulos share the court's understanding of Mr. Mahoney's "withdrawal." Absent a contrary showing, the court has no occasion to abandon its present understanding that Mr. Mahoney has withdrawn from the representation of his son.

Based on the foregoing, the court felt it necessary to call upon Mr. Mahoney to show cause why he should not be reprimanded by the court. Mr. Mahoney failed to justify his conduct to the court's satisfaction, and the court issued a formal reprimand. During the course of this action, Mr. Mahoney repeatedly shifted his burdens to opposing counsel and to the court. Accordingly, the court is constrained to conclude that Patrick Mahoney's conduct necessarily *must* be viewed as a "special circumstance" that *must* be reflected in the plaintiff's award of attorney's fees. Having carefully examined the conduct of Patrick Mahoney, the court, in the exercise of its discretion, will award the plaintiff a nominal fee of $200.00 for the legal services of his father. In awarding Thomas Mahoney this fee, the court has treated the plaintiff as a "fee-paying client" of his father.

Attorney Sullivan is necessarily affected by her association with the Mahoneys; this will be reflected in her hourly rate. Ms. Sullivan notified the court that she had not been aware that she would be involved in the action until the weekend before the trial began, which suggests that her pretrial preparation time was limited. She only served as trial counsel in the relatively short trial of the action (less than 15 hours of court time). Approximately three hours were expended in pursuit of the unsuccessful claims against defendant Smith. At an hourly rate of $75, and allowing her five hours of out-of-court preparation time in pursuit of the claims on which she eventually prevailed, the court will award her

attorney's fees of $1,275.00, for seventeen hours.

Although the plaintiff was at least partially a "prevailing party" under § 1988, an award of attorney's fees greater than $1,475.00 would be "unjust." Unless the court receives any objections from the parties before August 2, 1991, the court intends to direct the clerk to amend the judgment to reflect the award of $1,475.00 attorney's fees to the plaintiff from Officer Kesery.

Therefore, IT IS ORDERED that defendant Russell Kesery's motion for judgment notwithstanding the verdict be and hereby is denied.

IT IS ALSO ORDERED that defendant Russell Kesery's motion for a new trial be and hereby is denied.

IT IS FURTHER ORDERED that each party be and hereby is directed to serve and file objections, if any, to the court's planned award of attorney's fees no later than August 2, 1991.