Evelyn WILLIAMS, Plaintiff,

v.

PHARMACIA INC., a/k/a Pharmacia Ophthalmics, Inc., Defendants.

No. 3:94–CV–653RM.

United States District Court,
N.D. Indiana,
South Bend Division.

Nov. 21, 1996.

Tamara L. Renner, Banik and Renner, Elkhart, IN, John C. Hamilton, Doran Black-

mond Ready Hamilton and Williams, South Bend, IN, for Evelyn Williams.

Thomas J. Brunner, Jr., Paul J. Peralta, Kevin D. O'Rear, Kari A. Gallagher, Baker and Daniels, South Bend, IN, for Procordia Inc., Pharmacia Inc.

## MEMORANDUM AND ORDER

MILLER, District Judge.

After a six-day trial, the jury returned a verdict in favor of Evelyn Williams on her failure to promote, discriminatory discharge, and retaliatory discharge claims against her former employer, Pharmacia Inc. The jury awarded Ms. Williams $500,000 in compensatory damages and $750,000 in punitive damages. On April 2, the court reduced the compensatory damages award to the statutory cap of $300,000, vacated the punitive damages award, and awarded $180,330 and $115,513 in back and front pay, respectively.

Pharmacia renews its earlier motion for judgment as a matter of law on all claims against it, and argues that Ms. Williams did not prove she was intentionally discriminated against so judgment should be entered in its favor notwithstanding the jury verdict Pharmacia also moves for a remittitur or new trial because the jury's compensatory damage award is excessive and the evidence does not support a punitive damages awards. For the reasons that follow, the court denies the defendant's renewed motion for judgment as a matter of law, and denies the defendant's motion for remittitur or new trial.

## I. MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. Applicable Standard

In deciding a motion for judgment as a matter of law,[1] the court inquires whether,

making all reasonable inferences from the evidence and examining it in the light most favorable the prevailing party, the evidence supports a finding on each of the claims. *See Emmel v. Coca–Cola Bottling Co. of Chicago,* 95 F.3d 627, 636 (7th Cir.1996) ("A motion for judgment as a matter of law should be granted only when there can be but one conclusion from the evidence."); *Hutchison v. Amateur Elect. Supply. Inc.,* 42 F.3d 1037, 1042 (7th Cir.1994). Judgment as a matter of law is appropriate where, "without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict." *Freeman v. Franzen,* 695 F.2d 485, 488 (7th Cir.1982); *see also Cygnar v. Chicago,* 865 F.2d 827, 834 (7th Cir.1989).

Pharmacia's motion (as well as its reply brief) argues that Ms. Williams did not prove any of her three discrimination claims using either the direct method of proof or the indirect, burden-shifting method set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Ms. Williams claims that the evidence presented at trial "at least approaches" direct evidence, and that in any event, the absence of direct evidence is neither surprising in, nor fatal to, an employment discrimination claim. The court agrees with the latter assertion, *see Loyd v. Phillips Brothers, Inc.,* 25 F.3d 518, 522–523 (7th Cir.1994) (direct and indirect methods are alternative means of proving discrimination), and need not determine whether Ms. Williams's direct evidence would alone suffice to uphold the jury verdict. And, as Ms. Williams correctly points out, after trial on the merits, the burden-shifting analysis falls away, and the only issue remaining is wheth-

---

1. Rule 50 of the Federal Rules of Civil Procedure, which governs motions for judgment as a matter of law, provides in pertinent part:

    If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new

    trial under Rule 59. In ruling on a renewed motion, the court may:
    (1) if a verdict was returned:
    (A) allow the judgment to stand,
    (B) order a new trial, or
    (C) direct entry of judgment as a matter of law; or
    (2) if no verdict was returned;
    (A) order a new trial, or
    (B) direct entry of judgment as a matter of law.
    Fed.R.Civ.P. 50(b).

er the jury's verdict goes against the weight of the evidence, *Knox v. Indiana,* 93 F.3d 1327, 1333–1334 (7th Cir.1996); *Hybert v. Hearst Corp.,* 900 F.2d 1050, 1054 (7th Cir. 1990), under the standards set forth above.

■ For Ms. Williams to prevail on her discrimination claims (failure to promote, discriminatory discharge, and retaliatory discharge), the evidence must support a finding that Ms. Williams's gender was a motivating factor in Pharmacia's decision not to promote her and to discharge her, and, for her retaliatory discharge claim, a finding that her statutorily-protected activity was a motivating factor in Pharmacia's decision to discharge her.

## B. Discussion

Under the appropriate standard, from the evidence Ms. Williams presented at trial, and with all reasonable inferences drawn therefrom, the jury reasonably could find in her favor with respect to each claim of discrimination.

### 1. Failure to Promote

■ The jury found in Ms. Williams's favor on her claim that she was passed over in November 1993 for a promotion to the management position vacated by her immediate supervisor Mike Baker on the basis of her gender. Pharmacia argues that Ms. Williams did not make a prima facie case of discrimination because the evidence did not show that: (1) she "applied for" the position; or (2) she would have realistically been in the running for the job, had she even "applied." At this point, however, Ms. Williams need not prove a prima facie case of discrimination; the only relevant inquiry is whether the evidence supports a finding on each of the claims.

The record contains sufficient evidence to support the jury's verdict on Ms. Williams's failure to promote claim. Pharmacia did not solicit applications when a management position opened up; rather, it invited those in whom it was interested to interview. Mr. Baker testified to Ms. Williams's performance under him (he was her supervisor from late 1987 until he left in October 1994), which he considered to be excellent to better than good for the entire period. Ms.

Williams herself testified as to her belief that she was qualified for the position, having been with Pharmacia longer than all but one of those interviewed, and having higher Healon sales, higher average Healon selling prices, and similar or higher year-to-date 1993 dollar sales. Mr. Baker testified that he recommended to Randy Bailey, Director of National Sales, that Ms. Williams and two others, both men, be interviewed for his position when he left. Pharmacia interviewed the two men, and four other men, for the position, and chose Steve Wienecke; Ms. Williams was not invited to interview for the position. Mr. Baker also testified that he thought Ms. Williams deserved to be interviewed at least as much as the men invited to interview.

According to Mr. Baker, his overall ratings of Ms. Williams went down beginning in 1992 because Paul Lopez, Vice President of Sales & Marketing (to whom Mr. Bailey reported), refused to sign off on Ms. Williams's evaluations when they contained the higher ratings Mr. Baker believed appropriate. Based on Mr. Baker's ratings conflicts with Mr. Lopez regarding Ms. Williams, and on another incident involving a voice mail message Ms. Williams left, Mr. Baker believed that Mr. Lopez disliked Ms. Williams. Mr. Baker's testimony went further: based on his dealings with Mr. Lopez, his observation of Mr. Lopez's interaction with women salespeople, on feedback he received from women, and on his observation that Mr. Lopez did not fight the high overall ratings that Mr. Baker gave to male salespeople, Mr. Baker believed that Mr. Lopez was harder to get along with for women, and that he discriminated against women. From this evidence, and the reasonable inferences to which it leads, the jury could conclude that Ms. Williams was not promoted on the basis of her sex. *See Loyd v. Phillips Brothers, Inc.,* 25 F.3d 518, 523–524 (7th Cir.1994) (discussing purpose of "applied for" requirement; reversing trial court's finding for employer because trial judge's finding essentially "required [the plaintiff] to actively pursue a promotion when her male colleagues" were approached by the company for promotion).

## 2. Discriminatory Discharge

■ The jury also found in Ms. Williams's favor on her claim that she was discharged on the basis of her gender. With respect to this claim, Pharmacia argues that Ms. Williams did not establish a prima facie case of discrimination because she did not prove that she was meeting her employer's legitimate expectations, and that the evidence does not support a finding that her employer's proffered legitimate nondiscriminatory reason was a pretext for discrimination. Again, Ms. Williams need not prove that she could have survived summary judgment under the *McDonnell Douglas* analysis; the appropriate inquiry is whether the evidence supports the jury's ultimate finding that she was discriminated against because of her gender.

Although Pharmacia contended that Ms. Williams was terminated because of her poor performance and attitude, Ms. Williams presented evidence sufficient to support the jury's verdict in her favor. She presented evidence, including her own testimony and that of her former supervisor Mr. Baker, her performance evaluations, and memoranda she received once her "interim goals" began, from which the jury reasonably could conclude that Ms. Williams was subject to closer scrutiny, given interim goals that she could not have been expected to meet, then terminated when she (predictably) did not meet those goals, and that similarly-situated male salespeople were treated differently. Ms. Williams testified that she understood the quotas Pharmacia gave her as goals, and not as requirements, and that she was never told that any objective was more important than another. On March 4, 1994, Ms. Williams received her January 1994 review from her new supervisor, Mr. Wienecke. Her overall rating dropped from "Good Performance, 4. Meets Requirements" to "Good Performance, 5. Marginally Acceptable." [2] The review con-

tained, for the first time for Ms. Williams, eight objectives Ms. Williams had to meet over the next six months, several interim objectives, twice monthly co-travel or call-in requirements, a weekly reporting requirement. After the objectives and other requirements, the review contained a warning that failure to accomplish those objectives would "result in further discipline up to and including possible termination." No other salesperson received a review with interim objectives, or co-travel, call-in requirements, and reporting requirements, including two men who also received the same overall rating of "5. Marginally Acceptable." According to Ms. Williams, the January 1994 review was the first indication she had of any alleged performance problem.

Ms. Williams conceded that she did not meet the objectives set for her, but presented evidence to support a finding that the goals were unreasonable. Roger Skurski, Ms. Williams's expert statistical witness, testified that, when compared with other salespeople during the same period, Ms. Williams's first Healon objective could have been met, but the remaining objectives were out of the possible range. Mr. Skurski also stated that it looked to him as though the interim goals were designed to lead to Ms. Williams's termination. From the foregoing evidence, and reasonable inferences in Ms. Williams's favor, the jury could reasonably reject the reasons Pharmacia gave for Ms. Williams's termination.

In addition to evidence from which the jury could reasonably conclude that Ms. Williams was treated differently from male salespeople, Ms. Williams presented evidence supporting a reasonable inference that she was treated differently, and ultimately terminated, because of her gender. The "5" rating and January 1994 evaluation that led to the interim goals Pharmacia assigned Ms.

---

**2.** Since 1991, Pharmacia's overall performance rating scale was as follows:

| Excellent | 1. | consistently exceeds requirements |
| | 2. | exceeds majority of requirements |
| | 3. | occasionally exceeds requirements |
| Good performance | 4. | meets requirements |
| | 5. | marginally acceptable |
| | 6. | needs improvement |
| Unsatisfactory | 7. | unsatisfactory |

Williams came from Mr. Wienecke, who stated that he conferred with Mr. Lopez and Mr. Bailey regarding that evaluation. According to Mr. Wienecke, there were conversations about the time he was hired (October of 1993) regarding problems with Ms. Williams that might lead to dismissal. In addition, Ms. Williams presented the testimony of Mr. Baker, discussed above, regarding Mr. Lopez, how he felt about Ms. Williams, and how he felt about women in general. The evidence and the reasonable inference to which it leads, supports the jury's finding that Ms. Williams's gender was a motivating factor in her termination.

### 3. Retaliatory Discharge

■ The jury found in Ms. Williams's favor on her claim that she engaged in a protected expression, and that her protected expression was a motivating factor in Pharmacia's decision to discharge her. Pharmacia claims that the evidence presented cannot support the jury's verdict because Ms. Williams did not show that she grieved the pay issue to Mr. Wienecke or Mr. Ruben before January 21, 1994, when Mr. Wienecke signed Ms. Williams's review, the timing of her discrimination claim cannot alone lead to an inference of retaliation, and she did not present evidence that could support a finding that her protected expression caused her discharge. Pharmacia argues in its reply that the jury's verdict is especially suspect in light of its finding against Ms. Williams on her Equal Pay Act claim.

Pharmacia first claims that Ms. Williams did not present evidence that even her first conversation (with her regional manager) regarding what she perceived as a pay differential was made before Mr. Wienecke signed her review on January 21. Pharmacia's point on this issue is probably correct. Ms. Williams described having spoken with her regional manager, who said he would talk to Art Ruben (from Human Resources); having heard nothing, Ms. Williams contacted Mr. Ruben herself, who said that he would talk to Mr. Bailey. Then on February 18, Ms. Williams received a message from Mr. Ruben stating that she would not receive a salary adjustment, and would not be getting an annual increase either. The February 18

message from Mr. Ruben is the first date to which Ms. Williams testified in relation to her inquiries, and a finding by the jury that her talk with Mr. Wienecke occurred before January 21 might well be pure speculation. Nonetheless, Ms. Williams was not terminated on January 21. Even if Mr. Wienecke signed her review that day, and as Ms. Williams argued the review and its requirements were intended to get rid of her, the jury was not required to reason that Mr. Wienecke made the termination decision the day he signed the review. Though it may have been based on her 1/94 review, Ms. Williams also argued that the treatment she received after her review was discriminatory, and the jury reasonably could believe that the decisions and discrimination occurred over a period of time, and find retaliation in that treatment and ultimate decision to discharge based on the pay inquiry, even if made after the signing of the January 1994 review.

Moreover, regardless of the evidence regarding Ms. Williams's January 1994 conversations regarding what she perceived as a salary differential between men and women, Ms. Williams testified that she filed a claim of discrimination, based in part on the different base salaries she thought existed for men and women, in May 1994 after completing Pharmacia's grievance process. Ms. Williams's retaliation claim is based on her May 1994 protected activity, and not solely on her January or February inquiries regarding the pay issue.

With respect to Ms. Williams's May 1994 discrimination claim, Pharmacia argues that the retaliation claim rests solely on the timing of events, and that the timing in this case cannot lead to an inference of retaliation because Ms. Williams was terminated five months after her first grievance of the pay issue, and at least three months after her EEOC charge of discrimination. Pharmacia cites *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 321 (7th Cir. 1992), to support its argument that the mere lapse of time between a protected activity and an adverse employment action cannot support a claim for retaliatory discharge. *Juarez,* however, involved a six-month time

period between a discrimination complaint and the employee's termination, and the court found that the six-month period was not enough alone to raise an inference of retaliation. The court finds the Seventh Circuit's approach to the issue best explained in *McKenzie v. Illinois Dep't of Transportation*, 92 F.3d 473, 485 (7th Cir.1996), in which the court agreed with the district court's reasoning that "as the temporal distance between [the employee's] protected expression and the adverse action increased, it is less likely that there is a causal link between the two events." *McKenzie* involved an eleven-month time period.

Our research reveals that other cases which permit claims of retaliation after similarly long periods of time each involve additional circumstances which raised suspicion about the legitimacy of the employer's acts. *See, e.g., Moss v. Southern Ry. Co.*, 41 FEP 553, 1986 WL 10510 (N.D.Ga. 1986) (one-year time span between expression and retaliation did not defeat plaintiff's claim where termination was disproportionately severe punishment for minor error); *Ross v. Kansas Comm'n on Civil Rights*, 45 FEP 1476, 1985 WL 17574 (D.Kan.1985) (one-year time span did not defeat plaintiff's claim in light of plaintiff's prior outstanding job performance); *Shirley v. Chrysler First, Inc.*, 970 F.2d 39 (5th Cir.1992) (plaintiff's verdict affirmed, despite fourteen-month time span between expression and retaliation, where retaliation occurred two months after the EEOC dismissed the complaint). Because Ms. McKenzie cannot point to any other evidence that makes the January 1993 policy change suspicious, we agree with the district court that Ms. McKenzie has failed to establish the causation element of a prima facie case with respect to this incident. 92 F.3d at 485.

Neither *Juarez* nor *Holland v. Jefferson Nat'l Life Ins., Co.*, 883 F.2d 1307 (7th Cir. 1989) (also cited by Pharmacia), establishes that the period between Ms. Williams's charge of discrimination and termination, a week over three months,[3] as a matter of law,

cannot alone support an inference of retaliation, and the court's own research has not revealed such a case. In any event, this case presents circumstances other than the temporal sequence of Ms. Williams's protected activity and her discharge that support a finding of retaliation. First, Ms. Williams prevailed on her discriminatory discharge claim. This finding certainly does not compel a finding in Ms. Williams's favor on her retaliation claim, but it provides support for that claim; the jury reasonably could believe that those who would intentionally discriminate on the basis of gender also would react negatively to a woman's legal pursuit of her gender discrimination claim. Second, the reasons discussed regarding the timing issue for the January or February 1994 pay inquiries are relevant in the context of the May 1994 charge of discrimination. In Ms. Williams's theory of the case, her discharge was not an isolated and spontaneous event. She alleged, and (as discussed above) presented sufficient evidence to support, that Pharmacia set unattainable goals to set up her termination. The evidence viewed in the light most favorable to Ms. Williams showed that between her performance review in March and her termination in August, Ms. Williams was subjected to closer scrutiny than male salespeople, and to performance requirements that similarly situated male salespeople were not required to meet In this way, Ms. Williams's termination occurred over a period of several months, and her discrimination claim, made in May, came squarely in the middle of this process. The jury reasonably could view her May 1994 claim as a factor contributing to the treatment Ms. Williams received after her review, which in turn led to her termination in August.

### C. Conclusion

Pharmacia has not shown that the evidence presented at trial, granting the benefit of all reasonable inferences to Ms. Williams, leads to but one conclusion. The jury reasonably could find in Ms. Williams's favor on the factual issues, including questions of credibility, and reasonably find in her favor on all

---

**3.** The time period between Ms. Williams's charge of discrimination (May 3, 1994) and her termi-

nation (August 10, 1994) is three months and one week.

three discrimination claims. Sufficient evidence exists to support the jury's verdict in favor of Ms. Williams, and the court denies Pharmacia's motion for judgment as a matter of law.

## II. MOTION FOR NEW TRIAL OR REMITTITUR

### A. Applicable Standard

Pharmacia moves for a remittitur of the jury's compensatory and punitive damages awards, claiming that the award for lost earning capacity is improper, speculative, and causes double recovery, that the jury's remaining compensatory damages award is excessive when compared to similar cases, and that the evidence in this case does not support any award of punitive damages, and moves in the alternative for a new trial.[4]

The court agrees that a remittitur of the jury's damages award would be appropriate if it duplicated the court's damage award in this case, allowing Ms. Williams double recovery for her injuries. A new trial will be granted only when the verdict is against the weight of the evidence, the damages are excessive, or, for some other reason, the trial was not fair to the moving party. *Briggs v. Marshall*, 93 F.3d 355, 360 (7th Cir.1996); *Winger v. Winger*, 82 F.3d 140, 143 (7th Cir.1996).

### B. Discussion

#### 1. Lost Earning Capacity Award

The court's April 2 order reduced the compensatory damages award from $500,000 to the statutory cap of $300,000, but did not divide that award between the categories of compensatory damages the jury awarded, *i.e.*, did not delineate what portion came from the $250,000 award for "lost earning capacity" and what portion from the $250,000 for all other recoverable compensatory damages. Neither party addresses the issue, and no reason is apparent to the court to so apportion the damages because, as discussed below, at least $300,000 of the total damages awarded survive Pharmacia's motion for a remittitur or new trial.

■ Pharmacia contends that the jury's award of $250,000 for "lost earning capacity" should be vacated in its entirety for want of authority for such damages, and because it is speculative and duplicative of the court's award of front pay. Pharmacia argues that Ms. Williams has not presented authority that such an award is available. In any event, Pharmacia argues, the lost earnings award is duplicative of the court's award of one year of front pay because it relies on the same evidence as the front pay award, and because the court's back and front pay awards fully compensate Ms. Williams.[5] Lastly, Pharmacia contends that the lost earning capacity award is speculative because it is based on uncertainties, and must therefore be vacated.

Pharmacia cites courts that have used the terms "front pay," "future wages," and lost "earning capacity" interchangeably, and argues that "the measure of damages for lost earning capacity *is* lost wages." That other courts have used the terms interchangeably does not show that they are the same. The

4. Federal Rule of Civil Procedure 59 governs motions for a new trial, and provides in pertinent part:

   (a) **Grounds.** A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States....

5. Pharmacia first presented this argument in briefing the front pay issue after the trial in this cause. The court then responded:

   Finally, Pharmacia argues that any front pay award would duplicate the jury's award for loss of future earning capacity. Again, this argument has more force when addressed to a work life front pay award than when addressed to a more limited award. Dr. Skurski testified, and the court must assume the jury found, that Ms. Williams's termination reduced her attractiveness to other prospective employers, and reduced her earning ability, for her entire work life. For the reasons discussed above, any front pay award to Ms. Williams will not address her entire work life, so the injury for which compensatory damages were awarded will outlive any front pay award. Some slight overlap between the jury award and the front pay award will exist, but Ms. Williams will not receive the full measure of the jury award in any event.

*Williams v. Pharmacia Opthalmics, Inc.*, 926 F.Supp. 791, 798 (N.D.Ind.1996).

inquiry on this issue must go beyond the semantics of the nascent area of employment discrimination law to examine the meaning of the words, in general and in the context of this case and the goals of Title VII.

▉ Pharmacia argues that Ms. Williams has not presented authority for the proposition that Title VII allows recovery for lost earning capacity. However, in light of the make whole purpose of Title VII's remedy provisions, *see Albemarle Paper Co., v. Moody,* 422 U.S. 405, 417–419, 95 S.Ct. 2362, 2371–72, 45 L.Ed.2d 280 (1975), absent double recovery, the court believes that the burden properly lies with Pharmacia to show that a category of damages should not be available or is not necessary to make the victim of discrimination whole. In that regard, Pharmacia argues that Ms. Williams has not shown that "future pecuniary losses,"[6] includes "future lost earning capacity." Pharmacia directs the court to the EEOC's interpretive guidelines, which explain that pecuniary losses

> include, for example, moving expenses, job search expenses, medical expenses, psychiatric expenses, physical therapy expenses, and other quantifiable out-of-pocket expenses that are incurred as a result of the discriminatory conduct. . . .

> The Commission concludes that past pecuniary losses are out-of-pocket losses that occurred prior to the date of the resolution of the damage claim, i.e., conciliation, settlement, or the conclusion of litigation. The amount to be awarded for past pecuniary losses can be determined by receipts, records, bills, canceled checks, confirmations by other individuals, or other proof of actual losses and expenses.

> Future pecuniary losses are out-of-pocket losses that are likely to occur after

conciliation, settlement, or the conclusion of litigation.

*EEOC Policy Guidances on Damages Provisions of 1991 Civil Rights Act,* 8 FEPM 405:7091, 7095. The court agrees that pecuniary losses, past or future, does not include lost earning capacity. Lost earning power, the result of an injury to one's career and employability, cannot ever be proved using receipts or canceled checks, and is properly categorized as an intangible nonpecuniary loss:

> Damages are available for the intangible injuries of emotional harm such as emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life. Other nonpecuniary losses could include injury to professional standing, injury to character and reputation, injury to credit standing, loss of health, and any other nonpecuniary losses that are incurred as a result of the discriminatory conduct.

8 FEPM at 405:7096. Though the EEOC's nonexhaustive list of nonpecuniary losses does not include "lost earning capacity," it is closest to the notion of an injury to professional standing, and akin to injuries to reputation or character. The EEOC clearly contemplates a variety of nonpecuniary losses—losses, though difficult to quantify because of the intangible nature of the injury, for which recovery is appropriate where necessary to compensate the victim of discrimination. The availability of damages for lost earning capacity squares with Title VII's goal of providing make-whole relief to victims of discrimination. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417–419, 95 S.Ct. 2362, 2371–72, 45 L.Ed.2d 280 (1975) ("It is also the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination."; "The injured party is to be placed, as near as may

---

**6.** The term "future pecuniary losses" is found in the 1991 Civil Rights Act, which allows for recovery under Title VII for compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." These remedies are available in addition to the equitable remedies previously available, including back pay and reinstatement or front pay, though the new compensatory remedies are subject to the caps found in 42 U.S.C. § 1981a(b)(3).

Though Pharmacia does not explicitly argue that front pay is part of "future pecuniary losses," the court notes that the Equal Employment Opportunity Commission would disagree with such an interpretation of the damages provisions of the 1991 Civil Rights Act. *See EEOC Policy Guidances on Damages Provisions of 1991 Civil Rights Act,* 8 FEPM 405:7091, 7095.

be, in the situation he would have occupied if the wrong had not been committed." (*quoting Wicker v. Hoppock,* 6 Wall. 94, 99, 18 L.Ed. 752 (1867)); *Hutchison v. Amateur Elect. Supply, Inc.,* 42 F.3d 1037, 1044 (7th Cir. 1994).

Ms. Williams directs the court to *McKnight v. General Motors Corp.,* 973 F.2d 1366 (7th Cir.1992) (*McKnight IV*), as an example of the Seventh Circuit's recognition of recovery of damages for loss of earning capacity. Pharmacia claims that *McKnight* shows that front pay includes loss of earning capacity, and that the *McKnight* court did not address the issue. Pharmacia is correct that the court did not directly decide whether a plaintiff in an employment discrimination case can recover both front pay and lost earning capacity, but two factors lead the court to conclude that the Seventh Circuit would allow lost earning capacity damages similar to those awarded Ms. Williams. First, lost earning capacity as used in *McKnight* is not simply an equivalent to front pay. In *McKnight v. General Motors Corp.,* 908 F.2d 104 (7th Cir.1994)(*McKnight II*) a race discrimination claim under 42 U.S.C. § 1981 and Title VII, the Seventh Circuit remanded the case for the district court to reconsider its refusal to award the plaintiff reinstatement and to determine, if reinstatement was not appropriate, whether to award front pay. 908 F.2d at 115, 117. The court did so despite the fact that the jury had refused to award the plaintiff damages for loss of future earning capacity, 973 F.2d at 1370, and then noted in its later opinion that the district court relied in part on that decision in denying reinstatement and front pay. Had the court thought the issue resolved by the jury's finding, no rea-

son would have-remained to remand the case for reconsideration of the reinstatement and front pay issues. Second, in recounting the jury's decision not to award damages for lost earning capacity, the Seventh Circuit explained that "[d]amages for impaired future earning capacity are generally awarded in tort suits when a plaintiff's physical injuries diminish his earning power," and noted that it had affirmed such awards in employment discrimination cases in the past, citing *Morales v. Cadena,* 825 F.2d 1095, 1100 (7th Cir.1987), in which the court affirmed the jury's compensatory damages award based on the plaintiff's emotional turmoil, depression, and career disruption. *McKnight IV,* 973 F.2d at 1370. This discussion indicates that the Seventh Circuit understands lost earning capacity to represent a loss in one's future earning power, such as one caused by physical injury, and as distinct from the issue of front pay. The Seventh Circuit went on to describe the level of evidence necessary to support such a claim, and that separate issue is discussed further below.

■ Pharmacia next contends that Ms. Williams's front and back pay awards fully compensate her, relying on its expert, Dr. Joan Haworth, whose testimony Pharmacia claims the jury "apparently accepted" because its $250,000 award for future pecuniary losses is close to the $238,207 she estimated Ms. Williams lost for all future damages.[7] Pharmacia's explanation of how Ms. Williams will be fully compensated indeed comports with Dr. Haworth's analysis, and isn't far from the jury's "future pecuniary losses" award, but the court need not accept the losing party's experts' opinions, and the assumptions on which they are based, in reviewing the jury's award.

---

7. According to Dr. Haworth, Ms. Williams's termination could make getting another job more difficult, but that once she found one, her fifteen years of experience in the field would significantly influence her earning capacity and allow her again to begin making a comparable salary. This small but permanent gap in employment, Dr. Haworth testified, would amount to a $74,513 difference by age 57. Dr. Haworth testified that it would reasonably take Ms. Williams sixteen months from her termination to find new comparable employment, resulting in damages of $163,694 (sixteen months of Ms. Williams's Pharmacia salary). Thus, Dr. Haworth estimated Ms.

Williams's total loss in pay and earning capacity resulting from her termination to be $238,207. This conclusion is based on the assumption that Ms. Williams's benefits level in her new job will be the same as it was at Pharmacia (27.22%). Using Ms. Williams's expert's assumed benefits percentage (20.57%, arrived at using the figure for those in "professional speciality & technical" occupations from the U.S. Bureau of Labor Statistics, EMPLOYMENT COST INDEXES AND LEVELS, 1975–92, Bulletin 2413, November 1992 at 95), Dr. Haworth arrives at a total pecuniary loss figure of $328,395.

The similarity between the $238,207 suggested by Dr. Haworth to the $250,000 the jury awarded is not grounds for an assumption by the court that the jury accepted Dr. Haworth's testimony.[8]

Ms. Williams is not constrained by the assumptions of Pharmacia's expert, and without these assumptions, it is evident that the court's back and front pay awards do not, in any significant way, overlap the jury's award for loss of earning capacity. Dr. Haworth assumes that Ms. Williams will obtain a position in which "she will be able to earn the same average salary she was earning when she left Pharmacia," and that other than the lost wages, Ms. Williams's only loss in earning capacity caused by Pharmacia results from the time in which she is reasonably unemployed (sixteen months; a period she opines is influenced by Ms. Williams's having been terminated) and the effect that period has on her salary once she obtains her new and comparable employment, *i.e.*, the career disruption. Report of Dr. Haworth (filed September 6, 1995; Defendant's Trial Exhibit 41) at 7. Dr. Haworth calculated a total lifetime career disruption loss of $74,513, a figure that, by Dr. Haworth's reasoning, took into account her opinion regarding the effect of any "black mark" or career damage.

Ms. Williams disagrees with Dr. Haworth's assumptions. She contends that she will suffer the financial effects of having been terminated long into the future because her termination, and the fact that she sued her employer for discrimination, are "black marks" against her, making her less attractive to employers. She alleges a career injury as a result of having been terminated and having to sue her own employer. Ms. Williams testified that she attempted to secure employment in the field, trying four or five placement agencies, which, according to

Ms. Williams, wanted to know why she left Pharmacia. Ms. Williams learned of no comparable positions through the agencies. Ms. Williams also testified that she contacted the seven or eight other IOL companies, none of which was interested in offering her a position. Dr. Roger Skurski, Ms. Williams's expert, testified that Ms. Williams's lost earning capacity, based on certain assumptions, including Ms. Williams's age, education, and the "black mark" against her for having been terminated, could be quantified at $1,183,924. Based on this testimony, the jury reasonably could infer that Ms. Williams has suffered an injury to her earning capacity as a result of Pharmacia's discriminatory conduct.[9] Ms. Williams's knowledge and experience are in the specialized field of opthalmics; she tried to secure employment in the limited number of companies with equivalent positions, but was unable to do so, having to reveal the fact of her termination in those attempts.

■ The court's front pay award does not fully compensate Ms. Williams or place her in the position she would have been in had the discrimination not occurred. "Front pay" is an equitable remedy available when reinstatement is not possible or appropriate; "An award of front pay is designed to monetize the value of that lost opportunity." *Fortino v. Quasar Co.*, 950 F.2d 389, 398 (7th Cir. 1991). Front pay is intended to put the victim of discrimination "in the identical financial position that [s]he would have occupied had [s]he been reinstated." *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1231 (7th Cir.1995). Reinstatement (and therefore front pay), however, does not and cannot erase that the victim of discrimination has been terminated by an employer, has sued that employer for discrimination,

---

8. This is especially true in light of the fact that the $238,207 figure Dr. Haworth suggested includes back pay (the sixteen months from termination to the beginning of 1996, the date by which Dr. Haworth opined that Ms. Williams should have a comparable position), and the jury was specifically instructed not to award past or future wages or benefits. *See* Final Jury Instruction No. 15 ("In calculating damages, you should not consider any wages or benefits from Pharmacia, past or future, that Ms. Williams lost. I will calculate such an award if you find Pharmacia

liable."). The comparison Pharmacia attempts to make would really be between the $74,513 figure suggested by Dr. Haworth and the $250,000 the jury awarded, two figures not terribly similar.

9. Pharmacia does not directly challenge the bases of any of Dr. Skurski's opinions, or his qualifications to present them as expert opinions in this case.

and the subsequent decrease in the employee's attractiveness to other employers into the future, leading to further loss in time or level of experience. Reinstatement does not revise an employee's resume or erase all forward-looking aspects of the injury caused by the discriminatory conduct.

Further support for the lack of overlap in the front pay and loss of earning capacity awards is the presumption that the jury followed the court's instructions. *See Briggs v. Marshall*, 93 F.3d 355, 360 (7th Cir.1996); *United States v. L'Allier*, 838 F.2d 234, 242 (7th Cir.1988) ("Our theory of trial relies upon the ability of a jury to follow instructions."). The court gave the following instruction to the jury regarding compensatory damages:

> If you find that Pharmacia discriminated against Ms. Williams based on her sex, or that Pharmacia retaliated against her for activity protected by the Civil Rights Act, then you must determine the plaintiff's damages. **You may award compensatory damages only for injuries that Ms. Williams proves were caused by Pharmacia's allegedly wrongful conduct. In calculating damages, you should not consider any wages or benefits from Pharmacia, past or future, that Ms. Williams lost. I will calculate such an award if you find Pharmacia liable.**
>
> You may award compensatory damages for future pecuniary losses other than wages and benefits the defendant would have paid the plaintiff, emotional pain, suffering, inconvenience, and mental anguish if you find these were caused by defendant's allegedly illegal act.
>
> You may also award damages for any pain, suffering, or mental anguish that Ms. Williams experienced as a consequence of the defendant's violation of the Civil Rights Act. No evidence of monetary value of such intangible things as pain and suffering has been, or need be, introduced into evidence. There is no exact standard for fixing the compensation to be awarded for these elements of damages. Any award you make should be fair in light of the evidence presented at trial.

> In determining the amount of any damages that you decide to award, you should be guided by dispassionate common sense. You must use sound discretion in fixing an award of damages, drawing reasonable inferences from the facts in evidence. You may not award damages based on sympathy, speculation, or guess work. On the other hand, the law does not require that the plaintiff prove the amount of her losses with mathematical precision, but only with as much definiteness and accuracy as circumstances permit.

Final Jury Instruction No. 15 (emphasis added). The verdict form then specifically asked the jury to identify what portion of its compensatory damages award was for lost earning capacity, to which it answered $250,000. The instructions directed the jury not to include any lost wages or benefits in its compensatory damages award, and Pharmacia presents no reason to disregard the presumption that the july followed its instructions.

■ Having concluded that the lost earning capacity award does not meaningfully duplicate the court's lost wages and benefits awards, the court will address Pharmacia's remaining argument, that "the same considerations that counsel against this Court awarding front pay to age 57 also require that the jury verdict for lost *life-time* earning capacity be vacated," and that Ms. Williams's evidence on the issue of lost earning capacity does not meet the standard set forth in *McKnight*. The *McKnight* court noted that to recover for lost earning capacity, "a plaintiff must produce competent evidence suggesting that his injuries have narrowed the range of economic opportunities available to him.... A plaintiff must show that his injury has caused a diminution in his ability to earn a living." 973 F.2d at 1370 (*citing Gorniak v. National R.R. Passenger Corp.*, 889 F.2d 481, 484 (3d Cir.1989)). In *Gorniak*, a materials handler for Amtrak injured his right shoulder lifting a 325 pound cylinder and sued Amtrak under the Federal Employer's Liability Act (FELA), claiming that Amtrak's negligence caused his injury. 889 F.2d at 482. The jury awarded the

plaintiff $104,000, $35,000 [10] of which represented his lost earning capacity. On appeal, the employer challenged the sufficiency of the evidence to support the jury's award for the plaintiff's lost earning capacity. The Third Circuit discussed its decision in *Wiles v. New York, Chicago, and St. Louis Railroad Co.*, 283 F.2d 328 (3d Cir.1960),[11] another FELA case in which it reversed the district court's decision to set aside the jury's award of $20,000 for lost earning capacity because it was based on speculation. In *Wiles*, a medical expert testified at trial that the plaintiff would have trouble getting another job in heavy industry because "no employer would wish to hire him after discovering, by way of a routine pre-employment physical, his history of back problems," though the expert did not testify that the plaintiff was indeed unable to continue work in heavy industry. 889 F.2d at 483.

[In *Wiles*, w]e noted that Wiles' employment in a higher paying position did not preclude a recovery for loss of earning capacity, but was merely one of several factors for the jury to consider in deciding whether Wiles' economic prospects had been narrowed by his injury. The jury was also entitled to consider whether Wiles might be laid off or discharged in the future and whether the was chained to his present job in a kind of economic servitude because other employers were unlikely to risk hiring him.

We held that the presence of these and other factors provided a sufficient basis upon which the jury could have decided to compensate plaintiff for loss of future earning power; moreover, we concluded that the amount of lost earning capacity damages awarded was no more a result of speculation than a typical pain and suffering award. After all, since none of us is capable of foreseeing the future with any substantial degree of certainty every estimate of damages must contain elements of speculation.

We read *Wiles* as allowing a FELA plaintiff to recover a verdict for future lost earning capacity if he has produced competent evidence suggesting that his injuries have narrowed the range of economic opportunities available to him. This means that a plaintiff need not, as a prerequisite to recovery, prove that in the near future he will earn less money than he would have but for his injury. Rather, a plaintiff must show that his injury has caused a diminution in his ability to earn a living. Such a diminution includes a decreased ability to weather adverse economic circumstances, such as a discharge or lay-off, or to voluntarily leave the defendant employer for other employment. *Wiles* also expresses a preference for leaving the resolution of any uncertainty about whether such circumstances will come to pass to a properly instructed jury; a jury that may consider and weigh all the relevant factors and determine what price to place on a narrowing of a plaintiff's economic horizons.

*Gorniak*, 889 F.2d at 483–484 (internal quotations and citations omitted).

The plaintiff in *Gorniak* presented expert testimony that he was subject to permanent physical restrictions that would prevent him from performing in certain types of positions, and the Third Circuit found his evidence sufficient to support the jury's award, noting that even if the plaintiff remained with Amtrak (and Amtrak made a light-duty position permanently available to him), he "could still recover since he is under no obligation to remain with Amtrak, and the fact that his injuries hindered his ability to obtain other employment if he wished was one the jury could consider in deciding to award him damages." 889 F.2d at 484.

Ms. Williams has presented sufficient evidence to support the jury's award for lost earning capacity under the *McKnight* standard, as fleshed out by the Third Circuit in

---

**10.** In addressing post-trial motions, the district court reduced this figure to its present value of $29,981.69. 889 F.2d at 482.

**11.** In *Wiles*, the plaintiff was injured when a jack he was using to lift a rail car slipped and threw

him to the ground, causing serious injury to his back. He had three operations that resulted in permanent scarring and a minor deformity of the back. 889 F.2d at 483.

*Gorniak* and *Wiles.* Like the expert in *Wiles,* Ms. Williams's economic and statistical expert testified that Pharmacia's discriminatory conduct left a black mark against her that will have significant, long-lasting effects on Ms. Williams's attractiveness to potential employers, and to her earning capacity, despite Ms. Williams's continued ability to perform.[12] Ms. Williams recounted her unsuccessful attempts to secure employment in her small, specialized field, and that in so doing she was asked why she left Pharmacia. Although Pharmacia contends that the amount of the jury's award is speculatively excessive because it presumes that Ms. Williams would remain at Pharmacia indefinitely,[13] all that the award asserts is that, absent Pharmacia's discriminatory conduct, Ms. Williams would have been able to secure employment at the same level as she enjoyed at Pharmacia, a reasonable inference from Ms. Williams's evidence. As in *Gorniak,* the court believes there was sufficient evidence in this case to submit the question and all relevant factors to the jury for consideration. The jury was capable of weighing the relevant factors and determining "what price to place on [the] narrowing of [Ms. Williams's] economic horizons." *Gorniak,* 889 F.2d at 484. The process admittedly involves some level of speculation, akin to that involved in assessing other nonpecuniary losses such as emotional distress, but the level of uncertainty is unavoidable and acceptable, and was properly turned over to the july for determination of that fact.

■ Pharmacia does not separately argue that the award is excessive. In light of the evidence Ms. Williams presented, the court does not find the $250,000 "monstrously excessive." *See Lapinee Trade, Inc. v. Boon Rawd Brewery Co., Ltd.,* 91 F.3d 909, 911 (7th Cir.1996) (" 'Because fixing a damages award is an exercise in fact finding, only those awards that are monstrously excessive, born of passion and prejudice or not rationally connected to the evidence may be al-

tered.' ") (*quoting Pincus v. Pabst Brewing Co.,* 893 F.2d 1544, 1554 (7th Cir.1990)). The court does not find the jury's award for Ms. Williams's lost earning capacity improper, duplicative, lacking sufficient evidentiary support, or excessive, and declines to vacate any portion of the $250,000 award.

### 2. Award for Emotional Distress

■ The jury awarded Ms. Williams $250,000 for all other compensatory damages. Pharmacia contends that the award far exceeds awards in similar discrimination cases, and so must be reduced. Ms. Williams argues that Ms. Williams's emotional pain, suffering, inconvenience, loss of enjoyment of life, and mental anguish support the entire $250,000 jury award, and that in any event, they certainly support $50,000 of the award, the only portion left if the court upholds the jury's award for lost earning capacity.

■ When a motion for remittitur or new trial is based on the excessive nature of the damages, "the jury's award may be vacated and a new trial granted only if the verdict is monstrously excessive or if there is no rational connection between the evidence on damages and the verdict." *Inks v. Healthcare Distributors of Indiana, Inc.,* 901 F.Supp. 1403, 1409 (N.D.Ind.1995) (internal quotations omitted); *see also United States EEOC v. AIC Sec. Investigations, Ltd.,* 55 F.3d 1276, 1285 (7th Cir.1995) ("When reviewing a compensatory damages award, we make three inquiries: whether the award is monstrously excessive; whether there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and whether the award is roughly comparable to awards made in similar cases.") (internal citations and footnote omitted); *Raybestos Products Co. v. Younger,* 54 F.3d 1234, 1244 (7th Cir.1995) ("[A] jury award may be found impermissibly excessive only if the award is monstrously

---

**12.** That the jury apparently did not accept Dr. Skurski's valuation of Ms. Williams's lost earning capacity, awarding less than one-fourth of the amount Dr. Skurski assigned, does not change this conclusion.

**13.** To the contrary, the jury's award for lost earning capacity would seem to necessarily include an assumption that Ms. Williams would be forced, at some point, to find another job, and would then see the effects of the injury to her attractiveness to other employers.

excessive, a product of passion and prejudice, or without rational connection to the evidence."); *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1554 (7th Cir.1990). The court properly considers how an award compares to awards in similar cases in determining whether it is "monstrously excessive." *Littlefield v. McGuffey,* 954 F.2d 1337, 1348 (7th Cir.1992); *Bailey v. Andrews,* 811 F.2d 366, 374 (7th Cir.1987). After examining the circumstances in this case and the proof adduced at trial in light of awards for emotional distress in similar cases, the court agrees that the jury's $250,000 award is monstrously excessive.

Ms. Williams testified at trial that she was stunned when she was terminated in August 1994. She saw two psychologists—Dr. Pat McCabe and Dr. Jean McCutcheon—the former she spoke with before her termination, and the latter she visited once, shortly after her termination. Dr. McCutcheon testified at trial that Ms. Williams was referred to her from Dr. McCabe, who reported that she was having trouble with her job. When Dr. McCutcheon saw Ms. Williams, she was very distraught, having worked at Pharmacia for nine years with consistently good evaluations. Ms. Williams reported having been given difficult objectives to meet. Dr. McCutcheon explained that the results of not meeting difficult objectives, despite trying one's best, include frustration, deflation of self-esteem and desire to work as hard, and damage to one's overall well-being. One who loses a job despite thinking he or she is doing a good job suffers from a "grief reaction," Dr. McCutcheon opined, and Ms. Williams was experiencing disbelief, traumatic reaction symptoms, including numbness, hyper-vigilance, anxiousness, anger, and hurt. Dr. McCutcheon stated that such symptoms typically are short-term when associated with a job loss, and that she believed Ms. Williams to be strong, independent, and resilient. Dr. McCutcheon stated that she did not believe that Ms. Williams had begun to deal with her termination when the session occurred. Delayed stress reactions, Dr. McCutcheon warned Ms. Williams when she left her first and only session, were common; problems can continue for some time after the termination, especially when a suit is filed because

of the stress of the trial and let-down after that emotional drain. Dr. McCutcheon diagnosed Ms. Williams as having adjustment disorder and anxious mood.

When compared with awards in other employment discrimination claims, the jury's $250,000 award for emotional distress and other nonpecuniary damages (other than lost earning capacity) is monstrously excessive. In *United States E.E.O.C. v. AIC Security Investigations, Ltd.,* 55 F.3d 1276 (7th Cir. 1995), the jury awarded $50,000 for emotional damages for a terminal cancer patient discharged from his job in violation of the Americans with Disabilities Act. The Seventh Circuit found that the award was not monstrously excessive:

> Wessel claimed only emotional damages: basically depression, rage and fear resulting from his sudden firing. As the district court noted, Wessel's work was a very large pail of his life. He took almost no vacations, and his son testified that he sometimes even put his company above his family. Coupled with that background, the evidence showed that Wessel's wrongful firing was emotionally wrenching, even though he underwent no formal psychological treatment. He was cut off from one of the major defining aspects of his life, and he was forced to watch his family suffer emotionally and financially as well. As the district court pointed out, the emotional burden on a person dying of cancer, perceiving himself as unable to adequately provide for his family, is considerably greater than that suffered by the ordinary victim of a wrongful discharge.
>
> ... Ultimately, it may be that Wessel did not really deserve as much as $50,000, but that is not the question. The question is whether that award was grossly excessive, and it was not.

55 F.3d at 1285–1286. Dr. McCutcheon testified that Ms. Williams told her she wanted to stay in her job and really loved it, though she also noted Ms. Williams's strength, independence, and resilience, and that Ms. Williams had a strong support system in her mother and husband. Nothing in the record shows that Ms. Williams's family encountered dire financial circumstances as a result of her loss

of work. Ms. Williams no doubt derived great satisfaction from her job, but the emotional distress would appear less severe than that of the plaintiff in *AIC Security,* who, while dying of cancer, lost a "major defining aspect" of his life and was forced to watch his family suffer emotionally and economically as a result of the defendant's actions.

In *Fleming v. County of Kane,* 898 F.2d 553 (7th Cir.1990), the plaintiff had been subjected to progressive discipline and then fired in retaliation for his speech on a matter of public concern. The jury, as part of its damages award, awarded $120,000 for emotional distress, and the district court offered the plaintiff a new trial or an $80,000 remittitur. On appeal, the court upheld the $40,000 award, finding adequate support for it in the record, as not monstrously excessive in comparison with other such awards:

> The record in this case does show a rational connection between the evidence and the damage award. During the course of the trial, the jury heard evidence describing Fleming's humiliation at being subjected to defendants' adopted course of "progressive discipline." Specifically, Fleming testified to his embarrassment and humiliation at being reprimanded in front of his fellow employees, some of whom he had worked with for many years. Moreover, he testified to certain depression he suffered during the period in question, as well as to serious headaches and sleeplessness. Finally, this testimony as to his physical and emotional condition was supported by testimony from his wife and a fellow department employee. The testimony of Dr. Thomas A. O'Shea, Fleming's personal physician, indicates that the job stress which Fleming experienced during this period may have resulted in an aggravation of his physical condition. . . . In light of all this evidence, we cannot conclude that the award of $40,000 was unsupported by the evidence.

898 F.2d at 562.

The facts of this case bear some resemblance to those in *Fleming.* Like the plaintiff in *Fleming* Ms. Williams claimed, and the jury was free to accept, that she was subjected to closer supervision and more stringent and inflexible standards to set her up for failure and Termination. Shortly before her termination, Ms. Williams visited Dr. McCabe, who told her that her feelings of frustration were to be expected. Ms. Williams's testimony regarding her emotional distress shows that it began some time after March 1994, when she was given her performance review and interim objectives; she does not claim to have suffered emotional distress as a result of the failure to promote (and interview). Unlike the plaintiff in *Fleming,* however, Ms. Williams did not present evidence that she suffered depression or an aggravation of a physical condition as a result of Pharmacia's conduct.

The Seventh Circuit has found damage awards for mental distress to be excessive in several cases. The plaintiff in *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219 (7th Cir.1995), was discharged from his employment in retaliation for making a complaint that his employer was violating the Fair Labor Standards Act. In addition to awarding Avitia back wages (and the same amount as liquidated damages), the jury awarded him $21,000 for emotional distress. Avitia testified that when he was fired after working for the employer for thirteen years, he felt as though the Sears Tower had fallen on him, he was speechless, cried when he got home, and still felt the emotional pain by the time of trial. He found a new job within three months of his discharge, but had to leave that job when his son fell ill, and could not find a comparable job when his son improved. The Seventh Circuit held that the emotional distress award was too high by half:

> [T]here is more than the momentary pang, the momentary breaking down and crying, in this case. Avita testified that "until now I can feel that." He was testifying several years after he had been fired. Because he had worked for the same employer for so many years, it is plausible that he would have been deeply distressed by what he regarded, or least persuaded the jury that he regarded, as an unjustified and unjust discharge. We do not think it was unreasonable for the jury to award him some damages for this hurt, even considerable

damages; but $21,000 is too much. Judges and juries must not be casual with other people's money.

. . . We must treat this as a case in which a person who is fired is able to land a comparable replacement job in three months; and in these circumstances a protracted bitterness from the firing, especially in an era in which job insecurity has become the norm in American business cannot be presumed and is not adequately established by Avitia's brief testimony. As we said, it is not implausible that he should have been deeply upset at losing a job he had held for so many years; but the deep upset had to be proved, and was not.

49 F.3d at 1229. The court ordered a remittitur in the sum of $10,500. Though Ms. Williams testified regarding the difficulty she encountered, even until the time of trial, in finding a comparable position, she did not testify as to experiencing emotional distress as a result. Dr. McCutcheon's testimony supports the opposite conclusion; Ms. Williams was in a better position than most to cope with her situation as a result of her strong character and supportive family. Ms. Williams herself testified that, although she intended to set up another appointment with Dr. McCutcheon, she got busy instead, looking for another job.

The plaintiff in *Ramsey v. American Air Filter Co., Inc.,* 772 F.2d 1303 (7th Cir.1985), had been awarded $75,000 for mental distress stemming from his racial discrimination practiced and condoned by his employer, including discipline, lay-off and a hostile work environment.[14] The plaintiff testified that two incidents of racially motivated reprimands left him feeling as though he wasn't human and as though he had been slapped, and a co-worker testified that those incidents had left the plaintiff upset. The plaintiff's doctor testified that the ensuing unemployment had "preyed on him psychologically." On appeal, the court concluded that "This evidence clearly supports some award to compensate the plaintiff for the mental distress that he suffered. . . . In the absence of

any evidence that plaintiff was treated for emotional harm or that he became depressed for any sustained period of time, however, this court finds that $75,000 is excessive compensation for the humiliation that plaintiff experience. . . . [A]n award of $35,000 is the outermost award that can be supported on this record." 772 F.2d at 1313.

In *Cygnar v. City of Chicago,* 865 F.2d 827 (7th Cir.1989), the district court had ordered remittiturs of $40,000 of the $55,000 emotional distress awards made to each of several police officers transferred to less desirable positions because of their race and politics. The Seventh Circuit affirmed the $15,000 awards after examining awards ranging from $500 to $50,000 that had been affirmed in other cases involving unconstitutional firings, and noting that *Cygnar* involved transfers rather than firings.

As the Seventh Circuit noted in *Avitia v. Metropolitan Club of Chicago Inc.,* "[O]bviously the slighter the emotional distress, the lower the ceiling on a reasonable award of damages, [*i.e.,*] damages must be proportioned to the injury so that the slighter the injury the smaller must be the award of damages if the plaintiff is to oppose successfully a motion for a new trial or for a remission of damages (remittitur)." 49 F.3d 1219, 1229 (7th Cir.1995). This review of reported cases reveals that the jury's $250,000 award is obviously far out of line with awards in other discriminatory or retaliatory discharge cases. In light of the awards discussed above, and the evidence presented at trial, the court finds those damages the jury awarded Ms. Williams for her emotional distress and other nonpecuniary damages (other than loss of earning capacity) over $40,000 to be excessive. Ms. Williams had worked for Pharmacia for many years before her termination; the period of frustration at being given very difficult goals and disbelief at being discharged are not surprising. The evidence presented at trial, however, does not show that she suffered very severe or long-lasting emotional effects as a result of

---

14. *See also Moffett v. Gene B. Glick Co., Inc.,* 621 F.Supp. 244, 287 (N.D.Ind.1985) (following bench trial, district court awarded plaintiff $50,000 for emotional distress resulting from

harassment and retaliatory discharge; experts testified to need for prolonged psychotherapy to deal with anxiety that caused loss of sleep and appetite).

Pharmacia's discriminatory and retaliatory conduct.

■ Though the court finds the award excessive to the extent it exceeds $40,000, because the court finds over $10,000 (the portion of the $300,000 cap remaining after adding the $40,000 to the $250,000 award for loss of earning capacity) of the punitive damages award supportable by the record, it need not order a remittitur or new trial.

### 3. Punitive Damages Award

■ Having so far upheld less than all of the $300,000 award resulting from application of the statutory caps, the court must address the punitive damages award. The jury awarded $750,000 in punitive damages based on Ms. Williams's claims for discriminatory and retaliatory discharge. Pharmacia claims that the evidence in this case does not support any award for punitive damages, and that if any award is made, far less than the $750,000 awarded is appropriate.

■ Punitive damages may be appropriate in certain cases to punish the wrongdoer and deter others from similar conduct. *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1352 (7th Cir.1995). Title VII sets forth the standard for awarding punitive damages:

> A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

42 U.S.C. § 1981a(b)(1).

Title VII provides for punitive damages in employment discrimination cases. The prevailing party is not automatically entitled to such damages. To prevail only requires that the plaintiff have proven that intentional unlawful discrimination was more likely than not the reason underlying the adverse employment decision in question. Punitive damages require more. In order to secure punitive damages, the plaintiff employee must prove that the defendant employer engaged in the discriminatory practice "with malice or with reckless indifference to the federally protected rights" of the employee. 42 U.S.C. § 1981a(b)(1) ("Determination of punitive damages"). This is a higher hurdle than merely proving the underlying unlawful discrimination. *Emmel v. Coca–Cola Bottling Co. of Chicago,* 95 F.3d 627, 636 (7th Cir.1996).

Pharmacia discusses and distinguishes three cases in which courts found sufficient evidence from which the jury could find that the defendant acted with malice or reckless indifference and award punitive damages. In *Beardsley v. Webb,* 30 F.3d 524 (4th Cir. 1994), the plaintiff, a Second Lieutenant in the County Sheriff's Office, had been the subject of constant sexual comments and innuendos by her supervisor, and when she told him that they were inappropriate, he told her she had chosen a male-dominated field and that she could "just get out." After that incident, the supervisor's behavior changed; he gave the plaintiff the cold shoulder, regularly criticized her performance and questioned her orders. The plaintiff complained to the Sheriff, but her supervisor's behavior did not change, causing her squad to become insubordinate. *Id.* at 528. Her supervisor also had her investigated, asserting "fictitious facts and outright lies." The jury awarded the plaintiff $76,044 in compensatory damages and $8,000 in punitive damages. *Id.* at 529. On appeal, the defendant argued that the plaintiff was not entitled to punitive damages as a matter of law. The Fourth Circuit rejected that claim, finding that the supervisor's conduct after telling the plaintiff to get out "amply justified the jury's award of punitive damages." *Id.* at 531.

In *Hennessy v. Penril Datacomm Networks,* 69 F.3d 1344, 1354 (7th Cir.1995), the plaintiff's supervisor made unwelcome advances, and, once she became pregnant, he secretly added negative reports to her file while telling her not to worry about her probationary status. *Id.* at 1354. The jury found for the plaintiff, awarding $300,000 in punitive damages against the employer, though no compensatory damages. *Id.* at

1349. The district court reduced the punitive damages award to $100,000 pursuant to the damage caps contained in 42 U.S.C. § 1981a(b)(3). *Id.* at 1354. The Seventh Circuit agreed that the evidence presented supported an award of punitive damages, *id.*, though it remanded the case to the district court for reduction of the punitive damages award because "we do not think the case is so egregious that an award at 100 percent of what can legally be awarded against a company [that] size is appropriate." *Id.* at 1356.

Finally, in *Baker v. Runyon*, 922 F.Supp. 1300 (N.D.Ill.1996), the court awarded $50,-000 in punitive damages to an post office employee who was "taunt[ed], threaten[ed], and harass[ed]" by a co-worker at work. When she complained, nothing was done to end the harassment, and she was propositioned and subjected to sexual remarks by those to whom she complained. *Id.* at 1302. She went to the director of field operations at the main post office to complain of the harassment and request a transfer, but was dismissed as a troublemaker. *Id.* Her supervisors then assigned her the heaviest routes in retaliation for her complaints, and then refused her assistance (though others were given assistance on those routes) and threatened her with suspension when she didn't complete them. *Id.* On a cold day, the plaintiff was assigned an unheated vehicle; she complained to the station manager, but he laughed. She suffered frostbite as a result, which turned into a foot condition requiring surgery and the use of a cane. *Id.* The resultant medical condition required that the plaintiff be put on light duty, but the station manager assigned her heavy mail routes despite the availability of light routes. *Id.* The plaintiff was finally transferred, but not before her physical condition worsened and she experienced severe mood changes and depression, necessitating counseling. *Id.* The district court found $50,000 an appropriate punitive damages award, noting that the plaintiff was physically injured and that the case involved a "pervasive atmosphere, condoned and encouraged by supervisors, in which an individual [was] treated as the sport of an entire workplace," and that the defendant did not appear repentant. *Id.* at 1305.

According to Pharmacia, its actions stand in contrast to the situations in *Beardsley, Hennessy,* and *Baker* because there is no indication of sexual misconduct or physical injury in this case, and because Pharmacia actually tried to help Ms. Williams by pointing out her performance problems, though she did not take advantage of the helping hand Pharmacia offered.

Ms. Williams had a different view of the evidence. She claims that the jury could easily have concluded that Mr. Lopez did not like strong women, that he had gotten rid of several such women before Ms. Williams, and that after receiving the voice mail message Ms. Williams left him (critical of a marketing initiative), he began a conscious campaign to get rid of Ms. Williams, using Mr. Wienecke in the process. Ms. Williams claims that the evidence showed that she was hounded out of the company over a period of six months in which she was subjected to unfair criticisms that spread through the company grapevine. Ms. Williams asserts that the level of calculation and misuse of power justify punitive damages; she can attribute such actions only to an intent to inflict psychological cruelty.

The court agrees that, although the facts in this case differ from those in *Hennessy, Baker,* and *Beardsley,* the evidence presented at trial supports an award of punitive damages. From the evidence presented at trial, with all reasonable inferences drawn in Ms. Williams's favor, the jury could conclude that Mr. Lopez and/or Mr. Wienecke acted in reckless indifference to Ms. Williams's rights. Although Ms. Williams was not the victim of the lewd sexual misconduct variety of employment discrimination or physical injury, the jury reasonably could infer from the evidence that Ms. Williams, as a result of having inquired about her pay in relation to that of men and/or filed a claim of discrimination, and because of Mr. Lopez's harsher treatment or dislike of female salespeople, was tortured out of her position through the use of unreasonable sales requirements, imposed for the purpose of documenting her allegedly poor performance to create a "paper trail." The entire process took six months, in which she was subjected to closer scrutiny and reporting requirements than male employ-

ees. In addition, Ms. Williams testified that she did not receive her January 1994 review, which required her to go from 84% for IOL sales to 92% by the end of April, and then to 100% by the end of May, until early March. She believed that the goals were impossible, and that her ability to reach them was hampered by the late receipt of her review and by the declining market. Ms. Williams also testified that she received frequent letters from Mr. Wienecke stating that she had not achieved the required quota, referring to quota numbers from more than a month before, despite the usual availability of a month's figures the day after that month closes. For these reasons, Ms. Williams believed that Pharmacia's actions were not a "helping hand," but rather an elaborately calculated, long-term plan to get rid of her and cover up the discrimination and retaliation with a paper trail of her alleged performance problems. The jury was entitled to agree with her version, and to conclude that such actions constituted a reckless indifference to Ms. Williams's rights.[15]

■ Pharmacia then argues that even if some award of punitive damages is allowed, the jury's $750,000 award cannot be justified on the record of this case. "[T]he amount of punitive damages to which a plaintiff is entitled is determined by the degree of egregiousness of the underlying 'malice or reckless indifference.' " *Emmel v. Coca–Cola Bottling Co. of Chicago,* 95 F.3d 627, 636 (7th Cir.1996) (citing *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1355–56 (7th Cir.1995)). As Pharmacia points out, the maximum awards under the damage caps are appropriate for the more egregious sex discrimination cases. *Hennessy,* 69 F.3d at 1355. In *Hennessy,* the Seventh Circuit did not believe that the circumstances warranted a punitive damages award of the full $100,000 available under the damages cap, and remanded the case to the district court for a reduction of the punitive damages award. *Id.* at 1356. The facts simply could not compare to other, more egregious sex discrimination cases, *e.g.,* quid pro quo harassment cases, and the jury had denied the

plaintiff any compensatory damages for pain and suffering, emotional distress, and the like. *Id.*

The evidence that supports Ms. Williams's punitive damages award in this case is similar to that found supportive of the punitive damages award in *Hennessy.* The supervisor in *Hennessy* told the plaintiff not to worry about her probationary status while sending memoranda to others critical of her; the jury could have found that Ms. Williams was held to unreasonable standards for a period of months for the purpose of documenting that failure and to set up her termination. Both situations involve a variety of deception, and Ms. Williams's could be considered more egregious because of the frustration she experienced in trying to meet those goals. This case differs from *Hennessy* in important respects. First, Ms. Williams prevailed and was awarded punitive damages on two separate, though somewhat related theories of discrimination—discharge because of her sex and discharge because of her inquiry and/or claim relating to what she thought was a pay discrepancy. While this does not mean that she suffered twice the discrimination as those who prevail on only one claim, the court believes it has some relevance to the appropriate amount of punitive damages. Second, Ms. Williams received compensatory damages (that this court has upheld in this order) in the amount of $290,000 for her lost earning capacity and emotional distress/pain and suffering, unlike the plaintiff in *Hennessy,* who had received no compensatory damages. 69 F.3d at 1355 ("[W]e do not think the case is so egregious that an award at 100 percent of what can legally be awarded against a company [that] size is appropriate.").

The jury received the following instruction on punitive damages:

If you award Ms. Williams compensatory damages on any of her claims under the Civil Rights Act, the law allows you, but does not require you, to award punitive damages. These are awarded to punish a wrongdoer for outrageous conduct and to

---

15. Ms. Williams also ascribes Pharmacia's actions to an intent to inflict psychological injury, but no such inference is necessary to find reckless indifference to Ms. Williams's rights.

**1478**

deter others from engaging in similar conduct.

You may award punitive damages if you find, by a preponderance of the evidence, that Pharmacia engaged in a discriminatory practice or practices with malice or reckless indifference to the rights of Ms. Williams to be free from such intentional discrimination in employment.

If you determine that Pharmacia's conduct justifies an award of punitive damages, you may award an amount of punitive damages which all jurors agree is proper. In fixing the amount, you should consider the following questions: How offensive was the conduct? What amount is needed, considering Pharmacia's financial condition, to prevent future repetition? Does the amount of punitive damages have a reasonable relationship to the actual damages awarded?

If you do award punitive damages, you should fix the amount using calm discretion and sound reason. You must not be influenced by sympathy for or dislike of any party in the case.

The jury awarded punitive damages in the amount of one and one-half times the compensatory damages award. The court finds a punitive damages award of well over the remaining $10,000 supportable by the record in this case.

### III. CONCLUSION

For the foregoing reasons, the court DENIES the defendant's renewed motion for judgment as a matter of law filed Apr. 16, 1996 (# 110), and DENIES the defendant's motion for remittitur or a new trial filed Apr. 16, 1996 (# 112).

SO ORDERED.